[Civ. No. 6592.   Third Dist.—June 19, 1941.]

LOTTIE LISSAUER et al., Appellants, v. UNION BANK
& TRUST CO. OF LOS ANGELES (a Banking Cor-
poration) et al., Respondents.

Horowitz & McCloskey and Button & Mosher for Appel-
lants.

Paul J. Fritz, *in pro. per.*, Loeb & Loeb and Norman New-
mark for Respondents.

PULLEN, P. J.—This is an appeal from a judgment refus-
ing to reform or terminate a trust.

Dora Horn was the widow of Nathan Horn and the mother
of Lottie Horn, who was at one time known as Lottie Starrels
and now is Lottie Lissauer, and Harry Horn.   When Nathan

Horn died in 1927, his widow came into possession of approximately $55,000, as the beneficiary of certain policies of life insurance. She was inexperienced in business and could neither read nor write English. She had been born in Poland, and although she could speak English, was accustomed to use the Yiddish language in communicating with others.

After the death of her husband she sought the advice of his business associate, P. H. Koolish, and it was decided to put the money in trust, and Mrs. Horn and Mr. Koolish went to the respondent bank and there discussed the matter with Mr. Cameron, a trust officer of that institution.

The testimony as to what took place at the meetings concerning the trust arrangement is given largely by Mr. Koolish; Mr. Cameron, whose interest was only that of a trust officer, naturally not recalling the details of the meetings after the lapse of more than ten years.

Mr. Koolish testified that it was agreed the primary object of the trust was to protect Mrs. Horn during her life and to provide a modest income to care for her reasonable requirements, and a special provision to cover any emergencies. Having so provided for the mother, it was next to be determined what disposition should be made of the principal and income of the trust upon her death.

The original plan discussed, as Mr. Koolish testified, was a "permanent long time trust under which her money should be tied up not only during her lifetime but during the lifetime of the two children." But this plan was abandoned and Mr. Koolish then told Mr. Cameron, who was drafting the trust, " . . . that our discussion satisfied us that as long as Dora Horn was taken care of comfortably during her lifetime, and in view of the fact that Lottie was competent to take care of her own affairs, and Harry Horn had a separate trust which would take care of him for a number of years, that by the time Dora Horn passed away Lottie would be able to take care of herself with any funds that might be coming to her, and with this other trust which Harry had, it would not be necessary to protect that money beyond Dora Horn's death." On several occasions, so Mr. Koolish testified (and none of his testimony is contradicted), he told Mr. Cameron that the two children were to share alike in the ultimate distribution of any funds that might be left when Mrs. Horn died.

Mr. Cameron testified that in a conversation prior to the drafting of the trust agreement "Mr. Koolish told me that Mrs. Horn had funds with which she would like to create a trust for the benefit of herself and her children. . . . '' The document was drafted by Mr. Cameron, and then Mr. Cameron and Mr. Koolish undertook to explain to Mrs. Horn the document as prepared. At the time it was executed Mr. Koolish testified he presumed the trust agreement as prepared reflected Mrs. Horn's expressed intentions, and recommended to her that she execute it, which she did. She died in 1931.

The plan for the payment of principal and income of the trust fund after the death of Mrs. Horn, as provided in the agreement, was briefly, that upon the death of Mrs. Horn, one-half of the income of the trust was to be paid to each of the children during his or her lifetime; upon the death of either child, the trust should cease as to one-half thereof, and that proportion of the principal, together with any undistributed income, should be delivered by the trustee to the heirs at law of the deceased child, the income from the remaining one-half to be paid to the surviving child until its death; therefore the remaining principal and undistributed income to be delivered by the trustee to his or her heirs at law.

Immediately following the foregoing provisions appears this paragraph:

"This trust has been created by the trustor pursuant to a desire on her part to consummate a gift from her to Lottie Starrels and Harry Horn, her children, in consideration of the love and affection she bears to these beloved children. To this end, therefore, she has parted with all possession, title and rights of all kinds or description, in the property delivered to the trustee, except the reservation of the income as hereinbefore provided. Possession by the trustee of the assets of this trust as to principal, shall be for and on behalf of the beneficiaries, Lottie Starrels and Harry Horn, and their interests hereunder shall be construed to be vested as to title, and contingent merely as to the time of enjoyment.''

In the first provision it would appear neither beneficiary would ever have title to or possession of any part of the trust principal, the interest of each being limited to a life estate in one-half of the income only. Under the latter paragraph the children are given the principal, their interest

being vested as to title, but contingent as to the time of enjoyment. It is to be noted that the provisions of the first paragraph were a part of a printed trust form, but the latter section was not a form paragraph, but dictated by Mr. Cameron, the draftsman of the trust.

It is natural and usual in the creation of a trust to consider the beneficiaries as to their maturity, their characteristics as to being prudent and saving, or wasteful and extravagant, and their needs and relationship to the trustor. In this case such was done, and the testimony shows that Lottie, who was then married and known as Lottie Starrels, was perfectly able to take care of her own affairs and was a woman of business training and experience. Harry Horn was then still in college, and it was decided that a separate trust, sufficient to carry him for about eight or ten years, should be set up, which was done. That trust is not here an issue.

Upon the foregoing facts appellants claim the trust document contains two hostile and conflicting provisions and is therefore ambiguous; and by an amendment to the original complaint it is alleged the trustor, intending that her son and daughter should have the immediate distribution of the principal and income remaining at her death, executed the trust document in its existing form, mistakenly believing that it so provided, and that the provisions limiting the interests of the two children to the income were inserted by mistake.

Upon this latter allegation the court found it was not true that the bank failed or omitted to follow the instructions of Dora Horn.

It is the contention of appellants that in so finding, the trial court did so contrary to the evidence. The evidence upon this subject is limited to that of Mr. Cameron and Mr. Koolish. Mr. Cameron testified that in a preliminary conversation Mr. Koolish told him "Mrs. Horn had funds with which she would like to create a trust for the benefit of herself and her children. . . . " Mr. Cameron also recalled that he dictated the paragraph of the trust agreement which specifically provided that the title to the principal of the trust fund was to be presently vested in the two children, contingent only as to the time of enjoyment.

Mr. Koolish, a disinterested witness, was clear, positive and uncontradicted. He explained to the bank the pur-

poses of the trust and testified as to the conversations with Mr. Cameron. He told Mr. Cameron "the two children were to share and share alike in the ultimate distribution of funds," and "he was told they were to get a *pro rata* as between the two children Lottie and Harry," and when asked as to the *pro rata* of what, replied, "of any funds that might be left when Mrs. Horn passed away"; and again, "He (Mr. Cameron) was told after Dora Horn passed away the funds that might remain in the trust were to be distributed to Lottie Starrels and Harry Horn." This testimony is also corroborated by the dictated clause of the trust agreement, as well as by the testimony of Mr. Cameron, hereinbefore referred to.

Mrs. Horn could not read. Mr. Koolish read the agreement but did not ask Mr. Cameron concerning its contents or to construe its meaning, and then told Mrs. Horn that she was protected. In regard to his understanding of the document at that time Mr. Koolish said: "I can only say this in that we told Don Cameron what we wanted in the trust, and at the time it was read and signed I presumed that it covered what our intent was."

It would seem that the uncontradicted testimony of Koolish, corroborated as it is by Mr. Cameron in part, and by the surrounding circumstances, such as the recognized business ability of Lottie Horn, and the creation of a separate trust to protect Harry Horn until he reached maturity, and the fact that there was then but one grandchild, and nothing to indicate the birth or survival of any more grandchildren, that the court was bound by the uncontradicted testimony in support of appellants. The grandchild was not an heir at law of the grandmother, and there was no legal or moral duty upon the grandmother to provide for him. The evidence is clear, comprehensive and credible. We can see nothing inherently untrue or unreasonable in the testimony of Mr. Koolish, a disinterested witness, and as pointed out, we do find corroboration in the testimony of Mr. Cameron, in the surrounding circumstances, and in the document itself.

As said in *Pene* v. *Mauk,* 5 Cal. App. (2d) 428 [42 Pac. (2d) 697]:

"Where the testimony is inherently improbable, the court is under no obligation to accept the same, although uncontradicted, but where the testimony is not such, where there is nothing to indicate its improbability, or the untruthfulness

thereof, the rule is well settled that uncontradicted testimony cannot be ignored." (Citing, among other cases, *Michaels* v. *Pacific Soft Water Laundry,* 104 Cal. App. 366 [286 Pac. 172], and 10 Cal. Jur., p. 1143; *Stewart* v. *Silva,* 192 Cal. 405 [221 Pac. 191]; *Sun-Maid Raisin Growers* v. *Papazian,* 74 Cal. App. 231 [240 Pac. 47].)

From the foregoing it would appear the trial court erred in finding there was no mistake in the drafting of the trust agreement.

It would also appear that the instrument is so repugnant in its provisions as to be ambiguous and unworkable. This seems evident from a comparison of the two provisions already referred to, and particularly so in view of the effect to be given an original paragraph over a form paragraph as required by section 1651 of the Civil Code.

By this latter provision it appears that the purpose was to make and describe a gift to two beloved children, Lottie Starrels and Harry Horn, who were the only beneficiaries. For them the trustee is to possess the principal of the trust, and their interests as to principal shall be construed to be vested as to title, and contingent merely as to the time of enjoyment.

If the contention of the trustee is correct not one of the foregoing purposes is accomplished.

The judgment is reversed, and the trial court directed to make findings in accordance herewith and enter judgment in favor of plaintiffs.

Thompson, J., and Tuttle, J., concurred.