[Civ. No. 18983. First Dist., Div. One. Mar. 3, 1961.]

CATHERINE M. CLEVENGER, Respondent, v. EARL J. CLEVENGER, Appellant.

Marvin C. Hix for Appellant.

Sidney N. Brandis for Respondent.

TOBRINER, J.—We face here the difficult and unique problem of defining the duty of support which a husband owes to his wife's illegitimate child when the husband, from the date of the birth of the child, accepts the child into his family, publicly acknowledges the child as his own and treats the child as if he were legitimate. We shall point out that while under some circumstances the husband would be estopped to assert the illegitimacy of the child and thereby avoid liability for its support, we cannot ascertain in this record a sufficient basis for such an estoppel. Likewise, although the husband's express agreement to provide for the child may be enforceable, the record does not substantiate that agreement here. Finally, we find no merit to the husband's remaining claims that he should have been awarded a divorce on his cross-complaint and that the court erred in granting an additional attorney's fee and costs on appeal.

The respondent wife commenced this action for divorce upon the ground of extreme cruelty, praying the court for the custody of the minor child "of the parties hereto," for support and maintenance of herself and the minor child, for the community property and for attorney's fees and costs. Appellant husband filed both an answer controverting the charges and a cross-complaint alleging cruelty and excessive drinking on the part of respondent. The husband further averred that the child was not his child. The wife answered the cross-complaint, denying its allegations and asserting that appellant "condoned said alleged association with another man who is alleged to be the father of the child . . . and forgave . . . [respondent] and freely cohabited with her. . . ."

Respondent wife's case for divorce rested upon the testimony of three witnesses: her own, her sister's and her stepfather's. The wife recounted many instances when her husband drank heavily and physically assaulted her, inflicting serious injury. Respondent's sister testified that several times appellant in her presence castigated his wife with malodorous

names, including the opprobrium of "bum," and that at one juncture, appellant, while intoxicated, attacked and injured both his wife and the deponent, an incident which led to appellant's arrest. The stepfather corroborated the testimony as to appellant's name-calling, frequent drinking, and conflict with his wife. On one occasion the stepfather saw appellant beat his wife. The witness further testified that the wife herself did not drink heavily but only socially.

Appellant based his claim for a divorce upon his own and his mother's testimony. Appellant denied ever having struck his wife, but admitted pushing her away "to protect" himself from her scratching. He asserted that respondent could "drink pretty heavily"; that after drinking she would call him vulgar names, argue with him, fight and scratch him. Appellant's version of the episode involving the alleged beating of respondent and her sister directly contradicted their story. He contended that he had been sleeping and awoke to find the sister scratching him; he pushed her away and she fell; his wife called the police. He denied being intoxicated at the time. Appellant's mother declared that she had never seen her son intoxicated, but, to the contrary, she had at times observed respondent in an intoxicated condition; she had witnessed respondent fighting with and scratching appellant.

As to the child, respondent's counsel stated, "We admit that he [appellant] is not the natural father." The record shows that the child was conceived when the husband and wife were separated, appellant being at the time "in the Service in the discipline barracks in Fort Missoula, Montana," and respondent residing in San Francisco. "When he did come home," according to the wife, "we went back together and there was to be no . . . question about the child. . . ." In regard to the hospital arrangements for the birth of the child, the wife testified that the husband "indicated to the hospital" that he was the father; the husband, however, asserted, "I think all the arrangements were made before I ever was discharged. . . ." The birth certificate showed the name of the child as John Anthony Clevenger and that the attending physician certified that the information contained in it "was furnished by Mr. and Mrs. Clevenger related to this child as parents." The husband testified that he accepted the child into the family; the husband stated that he "showed a lot of affection" to the child and "to the best of . . . [his] ability . . . acted as a father" to the child. At the time of the filing

of the complaint, the boy was "approximately eleven years of age."

The court found that although appellant is not "the natural father of John Anthony Clevenger" appellant "from the time of said child's birth accepted said child into his family; that he publicly acknowledged said minor child as his own; that defendant treated said minor child as if it were a legitimate child." Awarding the custody of the minor child to respondent, the court ordered appellant to pay $50 per month to respondent for the support of the child.

The court granted respondent $25 per month as alimony and divided the property of the parties as follows: the rather small equitable interest in the house and the furnishings to respondent and the automobile to appellant. The judgment further provided that each party discharge one-half of the community debts and that appellant pay $300 for respondent's attorney fees. At a later date, after appellant's appeal, the court, on respondent's motion, ordered an additional $300 for attorney's fees and $100 for costs on appeal.

We shall consider separately each of appellant's points on appeal: that the court erred in requiring appellant to pay for the support of the child; that it erred in not granting the prayer of appellant's cross-complaint for a divorce, which, according to appellant, followed from his uncontradicted testimony; that the court erred in allowing the additional attorney's fees and costs upon appeal.

■■■ Since every presumption supports the judgment and since basic moral and social considerations impel the full protection of the child, we should affirm the order if it can be rested upon any valid legal basis. There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon, his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon. should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child. If any legal hypothesis can prevent such an inducement to publication of illegitimacy, we should adopt that theory. ■■■ We therefore examine each of the approaches suggested by respondent, and, although we do not believe this record sustains their application here, we point out that if the facts would establish an express agreement for the maintenance of the child or

an estoppel as to the child, as we explain it, the husband would be liable for the child's support.[1]

 Respondent's first theory, incorporated in the conclusions of law of the trial court "That defendant legitimated the minor child John Anthony Clevenger," cannot be upheld under the relevant statutes. Section 230 of the Civil Code providing that "The father of an illegitimate child" legitimates the child by acknowledging it as his own, receiving it into his family and otherwise treating it as a legitimate child, applies to such conduct only by the child's father. Indeed, the cases (*Estate of Baird* (1920), 182 Cal. 338, 347 [188 P. 43]; *Estate of Flood* (1933), 217 Cal. 763, 767 [21 P.2d 579]; *Estate of Lund* (1945), 26 Cal.2d 472, 492 [159 P.2d 643, 162 A.L.R. 606]), hold that as a condition to such legitimation the charged party must be the natural father. In view of the stipulation to the contrary in the instant case, section 230 of the Civil Code does not apply.

 Respondent's second hypothesis, that the husband stands in the relation of stepfather to the child and therefore becomes liable for his support, does not sustain the judgment. Section 209 of the Civil Code, which defines the duty of a husband who receives his wife's children by a former husband "into his family and supports them," declares that "it is presumed that he does so as a parent, and, where such is the case, they are not liable to him for their support, nor he to them for their services."

The obligation of the stepfather, however, is concurrent with the life of the relationship. In *Trudell* v. *Leatherby*

[1]The liability of the natural father for the support of his illegitimate child has been a dynamic and evolving one. Since we do not deal with the natural father here, that development is helpful, however, only as general background. The parent's duty to support was originally regarded as a moral rather than a legal obligation, but the failure of the common law to require such support has been largely changed by statute (see *Porter* v. *Powell* (1890), 79 Iowa 151 [44 N.W. 295]; Civ. Code, § 196a (added 1913)). "The rule of the common law exempting the father of an illegitimate child from responsibility for its maintenance has been here, as in many of the states, supplanted by a statute founded upon a more reasonable conception of social justice" (*Williams* v. *Amann* (Muni. Ct. App. D.C., 1943), 33 A.2d 633, 635). Thus, over the years, there has been an ever increasing imposition of liability both by statute and decision, and, as in other trends in the field of family law, it has been based more and more upon the acceptance of a relationship, and the *status* that flows from such relationship, rather than volitional agreement or contract. (*DeBurgh* v. *DeBurgh* (1952), 39 Cal.2d 858, 863 [250 P.2d 598]; *Aronstein* v. *Aronstein* (1959), 170 Cal.App.2d 494, 497 [339 P.2d 191]; *Hayes* v. *Hayes* (1960), 181 Cal.App.2d 634, 640-641 [5 Cal.Rptr. 509].)

(1931), 212 Cal. 678 [300 P. 7], a minor instituted an action to recover damages against his stepmother for personal injuries in an automobile accident. Holding that the stepmother occupied the status of a parent, the court reversed a judgment in favor of the stepchild upon the basis of the general rule that a child could not sue its parents in tort. In so ruling, the court held that while the acceptance of the stepchild into the family created the relation of *loco parentis* between the child and the stepparent, the obligation ran only so long as the relationship continued. The court cites 29 Cyc., page 1667, to the effect that: " 'A stepfather does not, merely by reason of the relation, stand *in loco parentis* to his stepchild; but where the stepfather received the stepchild into his family and treats it as a member thereof, he stands in the place of the natural parent, and the reciprocal rights, duties, and obligations of parent and child *continue as long as such relation continues.*' " (P. 681; emphasis added.) This limitation upon the life of the obligation is recognized in other jurisdictions *(Faber v. Commissioner of Int. Rev. (3d Cir., 1959), 264 F.2d 127, 129; State v. Bacon (1958), 249 Iowa 1233 [91 N.W.2d 395, 399]; Peake v. Peake (Dom.Rel.Ct. Kings Co., 1954), 205 Misc. 393 [128 N.Y.S.2d 631, 632])*. Corpus Juris Secundum states the rule: "The obligation assumed by a stepparent to support a stepchild is not a continuing one, but may be abandoned at any time, [footnote omitted] and ordinarily ceases with the divorce of the stepparent [footnote omitted]. . . ." (67 C.J.S. § 80, pp. 808-809.)

*Gonzales v. Pacific Greyhound Lines* (1950), 34 Cal.2d 749 [214 P.2d 809], contains a similar expression that the husband of the mother of an illegitimate child is not necessarily liable for the child's support. In that case the court held that an adjudication in a divorce action of the decedent husband's nonpaternity of the child did not bind him in his wrongful death claim as the son of the decedent husband in an action against a bus company. In the course of the opinion the court discussed the effect of the interlocutory decree of divorce which recited "that the decedent should not be required to contribute to plaintiff's [the child's] support." (P. 753.) The court states: "The absence of a support order in the divorce decree stemmed wholly from a finding of nonpaternity, and there would have been no legal basis for holding the husband liable in that action for the child's support." (P. 753.)

■ In a third attempt to sustain the judgment respondent urges various types of express oral contracts; she suggests

that an agreement to permit appellant to name the child would sustain appellant's obligation to maintain the child; she contends that a contract between respondent and appellant providing for the support of the child would rest upon sufficient consideration, and she argues that an oral contract to adopt a child has been upheld. Whatever the merits of these positions from a legal standpoint, we fail to find substantial evidence in the record to sustain their application here.

While respondent cites cases for the proposition that her agreement to permit appellant to name the boy would rest upon sufficient consideration, we can ascertain no reference in the record to any such specific covenant. It is true that the mother testified that "Mr. Clevenger indicated to the hospital" that he was the father of the child, and that the birth certificate shows that the child was known as John Anthony Clevenger; nevertheless there is no evidence of any agreement on the part of appellant that in consideration of his right to name the child he would support it.

A similar objection applies to the claimed oral contract of appellant to maintain the boy. The record shows that after discussing the problem with his mother and being advised by her that he should " 'go back with her and try to raise this child,' " appellant phoned respondent and said, " 'Can I be sure that the father of this child won't turn up?' " Upon respondent's answer that appellant could be so assured, appellant returned and "tried to be a father" to the child and "acted as a father toward him." We must distinguish, however, between the accommodation that appellant may have given to his wife in accepting the child and an express agreement to support the boy. The nebulous character of the evidence fails to show a clear oral agreement of support on the part of the husband.

On the other hand, we see no theoretical reason why a contract for the support of an illegitimate child during its minority between the mother and the mother's husband would not be enforceable. The husband receives as consideration the custody and control of the child as well as the right to its earnings.[2] We believe the cases and authorities sustain such an undertaking.

---

[2]The question arises whether the possibility that the natural father might claim and obtain custody of the child at a later date negates consideration to the putative father. This remote contingency should not defeat the benefit to the putative father of immediate and continuing custody of the child. If we were here confronted with the contract of

In a somewhat analogous situation the court in *Spellens* v. *Spellens* (1957), 49 Cal.2d 210 [317 P.2d 613], upheld the enforceability of a contract by a third person for the support of children of a woman whom he promised to marry. In that case the plaintiff mother brought an action "on the alleged oral agreement that defendant promised plaintiff both before and after the commencement of the divorce action which resulted in the interlocutory decree from Robert that if she would divorce Robert and marry him he would divide all his property with her and support her children. . . ." (P. 222.) The court, inferentially at least, holds that an agreement for support would be valid, saying: "A husband and wife may agree with each other as to their property rights [footnote omitted] and of course defendant is not liable for the support of plaintiff's children by Robert *in absence of an agreement,* adoption or some other arrangement. She might under such an agreement obtain an interest in defendant's separate property as well as the community property as support for her children by Robert to which she would not otherwise be entitled." (P. 223; emphasis added.) In *Spellens,* the court rejected the contention that the involved agreement would be "against public policy or promotive of divorce." (P. 225.)
 The mother of the children there apparently agreed to marry defendant, and this promise would constitute a different kind of consideration than in the instant case, but the opinion refers to the fact that as a result of defendant's "promises she was induced to claim no alimony from Robert. . . ." (P. 223.) In our case the agreement of the husband could have induced the wife, upon behalf of the child, not to require support from the natural father.

The case of *Rogers* v. *Schlotterback* (1914), 167 Cal. 35 [138 P. 728], upholds a contract which provided that in return for the custody of a child, the child would receive support and be entitled to a share in the putative parents' property. The claimant, Taylor Logan (later named James Taylor Rogers) rested upon the terms of an oral contract by which one Rogers and his wife "promised and agreed" with the child's father that they would "rear, educate, love and cherish

the natural father to support the child we would entertain no doubt of its enforceability. The courts, however, usually state that the consideration lies in the father's statutory obligation to support his own child. (*Redmon* v. *Roberts* (1929), 198 N.C. 161 [150 S.E. 881], 882]; *Thayer* v. *Thayer* (1925), 189 N.C. 502 [127 S.E. 553, 555]; *Williams* v. *Amann,* *supra,* 33 A.2d 633, 635; but see *Burr* v. *Phares* (1917), 81 W. Va. 160 [94 S.E. 30].)

said Taylor Logan, and upon death . . . make him an heir to share in their estate equally with their daughter, provided they could be given the entire and exclusive charge and custody of said infant.'' (P. 37.) The Rogers reared the child, but William Rogers, the husband, left the property by will to defendants. Impressing a constructive trust upon the property for plaintiff, the court stated that it was ''thoroughly established'' '' [t]hat such an oral contract may be specifically enforced in favor of the promisee who has performed his part thereof. . . .'' (P. 45.)

The early case of *Healey* v. *Simpson* (1892), 113 Mo. 340 [20 S.W. 881], describes the characteristic of the consideration which sustains such an agreement to maintain a child. In that case, the mother granted the ''custody and absolute control of her infant daughter'' to the Brewsters,. who agreed to ''adopt'' the child ''as their own,'' and to ''govern, educate, maintain, and in all respects treat said child as though she were their own natural offspring. . . .'' (P. 882.) The Brewsters failed to adopt the child legally but maintained her, and the question then arose as to whether or not the agreement that she inherit as a legitimate child would be enforceable. While the court points out that the instrument could not ''operate as an adoption, as it did not come up to legal requirements,'' the court held that the agreement could operate as a ''contract for adoption.'' (P. 883.) The court defines the consideration which upholds the contract: ''. . . Brewster . . . gained the companionship of one who added much, no doubt, to his enjoyment of life. The sundering of natural ties and the formation of artificial ones for the enjoyment and gratification of the party at whose instance this is done is held, and ought to be held, to be such a consideration as the courts will recognize as valuable where the other party has in good faith acted on and carried out the agreement on his part. This is upon the principle that the parties cannot be put *in statu quo.* In the very nature of things, nine years in the life of a child so change conditions that it is out of the power of an earthly tribunal to restore the parties to their original situation and environment, and the courts therefore compel them to stand upon and abide by the record they have made.'' (P. 883.)

Finally, the promise by the putative father to support the child would fall within the sanction of section 90 of the Restatement of the Law of Contracts, declaring: ''A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the

part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." (For examples of contracts of this type, see *Banning* v. *Krieter* (1908), 153 Cal. 33 [94 P. 246]; *Seymour* v. *Oelrichs* (1909), 156 Cal. 782 [106 P. 88, 134 Am.St.Rep. 154].)

The prerequisite to any such consensual obligation is, of course, the consummation of an express agreement and its partial performance. The trial court made no finding that the parties agreed to such a contract; we cannot append a contract to facts not found.

Respondent's contention as to a possible agreement of adoption by the husband meets the same difficulties. Without analyzing the legal validity of an agreement to adopt, we are met at the threshold by an absence of proof of any such express understanding. Again, the court did not find that such a contract existed. We are therefore forced to conclude that the record does not substantiate any one of respondent's three contentions as to express oral contracts of support.

Respondent finally argues, "The actions of the parties . . . should be considered sufficient to have fixed the status of the child beyond the power of either plaintiff or defendant to question its legitimacy." In this regard respondent cites cases for the proposition that "a mother should not be permitted to assert the illegitimacy of a child born in wedlock in order to obtain some benefit for herself [footnote omitted]." (10 C.J.S. § 15, pp. 76, 77; *Gossett* v. *Ullendorff* (1934), 114 Fla. 159 [154 So. 177]; *Flint* v. *Pierce* (Sup. Ct. Erie Co., 1912), 136 N.Y.S. 1056. See to the same effect: *Colson* v. *Huber* (1946), 74 Ga. 339 [39 S.E.2d 539].) Since we probe here the liability of the mother's husband rather than the mother, the cases upholding an estoppel against the mother do not, as such, and upon this record, establish an estoppel against the putative father. As we suggest, *infra*, they are useful only on the basis of analogy.

As to an estoppel against the husband from asserting the illegitimacy of the child in order to avoid its support, the record fails to contain the requisite requirements. The record does not show that the *husband represented himself to the child* as his natural father. Although the findings of fact state that appellant accepted the child, publicly acknowledged and treated the child as his own, the court did not find that the husband made a direct or implied repre-

sentation to the child that he was the boy's father. The child may have known that appellant was not his father.

If the facts should show, however, that the husband represented to the boy that he was his father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon the representation and treated the husband as his father and gave his love and affection to him, that the child was ignorant of the true facts, we would have the foundation of the elements of estoppel. (*Safway Steel Products, Inc.* v. *Lefever* (1953), 117 Cal.App. 2d 489 [256 P.2d 32]; Code Civ. Proc., § 1962, subd. 3; 18 Cal.Jur.2d 406.)

Breaking down the factors involved here, the benefits to the husband in such instance would be (1) the bestowal upon him of the love and affection of the child as a natural child, based upon the representation that the husband was the natural father, (2) the substitution of the husband in the status of father in the place of the natural father, so that the putative father would have the possession and custody of the child instead of the natural father, and the right to the child's earnings, (3) the community's recognition of the husband as a father, a status from which appellant undoubtedly derived prestige and fulfillment.

The husband's representation that he was his natural father would cause these consequences and detriments to the child: (1) It would deprive the child of the potential action of the mother, as his guardian, at the time of the child's birth, to hold the natural father liable for the support of the child. The child thus relies upon the husband's representation and does not attempt to find the natural father. As of the present date it is realistically impossible to do so. This reliance works a definite detriment to the child. (2) It would induce the child to accept the husband as his natural father and render to him the affection and love of a son, with the son's reasonable expectation of care, support and education until adulthood. The reversal of this representation, through the publication of the illegitimacy of the child, inflicts deep injury upon him. To be designated as an illegitimate child in preadolescence is an emotional trauma of lasting consequence. Having placed the cloak of legitimacy upon the child, having induced the child to rely upon its protection, the husband by abruptly removing it surely harms the child. The child has therefore relied on the conduct of the husband to his injury. (3) It would induce the child to hold himself out to the community

as the natural son of the husband, one of the benefits which the appellant apparently desired, only to suffer the abrupt removal of that status, and to undergo the subsequent social injury.

These are the elements of estoppel, and that they would, if established, apply here in unusual circumstances, does not make them the less appropriate. If we sanction them in dealing with property in commercial transactions, we do not discard them in dealing with a child and an asserted father involved in a deep-rooted human relationship. As the writers in 10 Corpus Juris Secundum, page 76 (Bastards, § 15) point out, an estoppel against the assertion of illegitimacy has been applied to the mother of illegitimate children; ". . . a mother may, by her conduct in holding herself out to persons interested and to the world as the lawful mother of her children and by continued assertion of their legitimacy, be estopped or precluded to change her position in this regard to the detriment of such children [footnote omitted]." ( P. 77.)

The cases uniformly sustain the proposition that the mother cannot, in order to enforce the liability of a natural father pursuant to a contract of support, bastardize her own children. (*Flint* v. *Pierce, supra,* 136 N.Y.S. 1056; *Colson* v. *Huber, supra,* 74 Ga. 339 [39 S.E.2d 539].) The same principle should apply by analogy to the putative father.

While we have found no case which squarely pertains to the situation in which the putative father asserts the illegitimacy of the child, the court in *Gossett* v. *Ullendorff, supra,* 114 Fla. 159 [154 So. 177], holds that a mother who, about a week after their birth, accepted twin children of other parents, and represented to her husband and to the world that they were the children of her husband and herself, was estopped from asserting the true situation. Recognizing that the element of injury to the children "cannot be said to exist in a material sense," (p. 180) the court points out, "no one can say what the psychological reaction upon them may be on the discovery that the person whom they had all their lives learned to love and revere as their father was not their parent in fact. So in a sense it is entirely possible that the two children have been injured by the deceitful or disingenuous conduct of the complainant during the years in which to gratify her own purposes she secured the assurance of personal and domestic satisfaction and comfort by her course of conduct." (P. 181.) The court likewise recognizes the nature of reliance which children place upon representations as to a putative

parent, to which we have previously alluded. The court concludes: "So we hold that the complainant by her course of conduct through a period of more than twenty years, during which she daily and hourly declared to her husband and to the world that her husband was the father of the children, will not now be heard to say that he was not, when by so doing she seeks to deprive the children of a portion of the inheritance which otherwise would be theirs." (P. 181.)

The doctrine of estoppel has been applied in an action for separate maintenance which sought among other matters, "an allowance for . . . support" of the children of the putative wife "on the theory of putative spouse." (*Spellens* v. *Spellens, supra,* 49 Cal.2d 210, 215.) The reputed husband, who "represented that upon the granting of the interlocutory decree he and plaintiff could be legally married in Mexico" (p. 214), and who thereafter procured such a marriage and lived with plaintiff and her children, was estopped from asserting the illegitimacy of the marriage. The court said, ". . . defendant by reason of his conduct will not be permitted to question its validity or the divorce; so far as he is concerned, he and plaintiff are husband and wife. The interlocutory decree declared that the parties were entitled to a divorce and it was not unreasonable for plaintiff to have been led to believe that a marriage in Mexico would be valid. The circumstances here clearly show fraud and estoppel as far as the defendant is concerned; it would be difficult to imagine a stronger case in this field of law." (P. 221.)

If the doctrine of estoppel applies to the deceived putative spouse, it should apply to the deceived putative child. It is true that the court did not apply this doctrine to a paternity case in *Anderson* v. *Anderson* (1931), 214 Cal. 414 [5 P.2d 881], but in that situation the putative father himself suffered the deception that the child was his natural issue; he was accordingly not estopped "from disclaiming fatherhood when the facts became known." (P. 417.)

Appellant's two countervening contentions as to such an estoppel cannot stand. He initially argues that respondent was not misled by appellant's conduct, did not "rely upon his conduct in any way" and was not "injured" by it. Appellant mistakes the party in whose favor the estoppel would run. The putative father would be estopped as to the child, not as to the mother. We deal here in child support, not alimony.

Appellant secondly argues that the contention as

to an estoppel was "not raised in the trial court" and that it was not pleaded. The record in the trial court, however, is replete with testimony as to the putative father's acceptance of the child into his family, his acknowledgment and treatment of the child as his own. These are the crucial elements of the estoppel which, properly augmented as we have indicated, would bind the husband. ▆▆▆ As to the pleading, respondent alleged that the boy was the "child of the parties hereto"; appellant's *denial* caused respondent's invocation of the estoppel. In this posture of the case respondent was not required to plead the estoppel. As the court said in *Kessinger* v. *Organic Fertilizers, Inc.* (1957), 151 Cal.App.2d 741 [312 P.2d 345] : "The appellant raised the issue which invited the application of the doctrine of estoppel, and under such circumstances it is not necessary that the plaintiff plead estoppel." (P. 755.) *Corporation of America* v. *Harris* (1935), 5 Cal.App.2d 452 [43 P.2d 307], is likewise pertinent: "Appellant's claim that estoppel must be pleaded is without merit. It has been held that when the doctrine is relied upon as a defense, it must be pleaded if there is an opportunity to do so (*Peerless Motor Co.* v. *Sterling Finance Corp.*, 139 Cal.App. 621 [34 P.2d 738]) ; but the rule does not apply to a plaintiff's pleadings. [Citing cases.]" (P. 462.) (To the same effect: *Wilson* v. *Grey* (1942), 49 Cal.App.2d 228, 231 [121 P.2d 514].) This rule applies with particular force in a case which involved the obligation of support of a child.

The relationship of father and child is too sacred to be thrown off like an old cloak, used and unwanted. We are dealing with the care and education of a child during his minority and with the obligation of the party who has assumed as a father to discharge it. The law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered.

We have been careful, however, to restrict the indicated liability of the putative father to the case in which he represents to the child expressly or by implication that he is the child's natural father and the child believes him to be the natural father. We do not suggest that the husband who supports his wife's child by another man necessarily incurs liability for the support of that child. Here, if the facts so show, we predicate an estoppel upon the child's acceptance of the representation of the putative father that he is the natural father. The analogous situation in which the putative

husband may be charged with a putative marriage rests upon the reputed wife's "belief in the existence of a valid marriage." (*Vallera* v. *Vallera* (1943), 21 Cal.2d 681, 684 [134 P.2d 761].)

We emphasize a second limitation on the husband's liability: the representation must be of such long continuance that it frustrates the realistic opportunity of discovering the natural father and truly establishes the paternal relationship of the putative father and the child. We do not discuss here a relationship of some passing days; this relationship continued over the span of a decade.

Given these conditions, we believe the law has outgrown the stage when the stigma of bastardy was such that it would defeat the fulfillment of the putative father's obligation of support during minority, an obligation assumed by the assertion of fatherhood and by the acceptance of a status, which in truth, is not a burden but a benefaction.

Appellant's second contention, that he was entitled to a divorce on his cross-complaint, based upon the allegedly uncontradicted testimony of his mother and himself, splinters on the familiar rock that the trial court resolves such questions of fact and that the findings will not be disturbed if supported by substantial evidence. Although respondent did not specifically contradict appellant's testimony that she called him vulgar names, scratched him on many occasions, and engaged in excessive drinking, she and other witnesses told entirely different stories concerning the several specific instances of their conflicts. Respondent indicated that appellant had initiated all the quarrels of the two; appellant asserted the antithesis. If, as the findings show, the trial court believed respondent's, and disbelieved appellant's version, the court properly granted the divorce to respondent.

Appellant cites several cases such as *Lissauer* v. *Union Bank & Trust Co.* (1941), 45 Cal.App.2d 468, 472-473 [114 P.2d 367], and *Pene* v. *Mauk* (1935), 5 Cal.App.2d 428, 434 [42 P.2d 697], for the proposition that uncontradicted, uncompelled evidence which is not inherently improbable cannot be disregarded, and others, such as *Peterson* v. *Peterson* (1946), 74 Cal.App.2d 312, 318 [168 P.2d 474], and *Poe* v. *Lawrence* (1943), 60 Cal.App.2d 125, 132 [140 P.2d 136], for the rule that evidence cannot be rejected as inherently improbable unless either a physical fact destroys the possibility of its authenticity, or its falsity becomes apparent without resort to inferences or deduction. These rules cannot

aid appellant, however, because respondent's narration of the facts impliedly contradicted his own. Respondent's denial of any heavy drinking and her charge that appellant had severely beaten her, on those occasions which they mutually identified, sufficiently defeated appellant's allegations that respondent "was continually drinking, abusing him, scratching his face and doing all sorts of things that made life miserable for him. . . ."

Appellant's final point, that the court erred in allowing respondent her attorney's fees and costs on appeal, calls for only brief discussion. While appellant argues that respondent "is in a much better position to pay her attorney than is the appellant," the allowance of the fees lies in the "sound discretion of the trial court" (*Brown* v. *Brown* (1958), 162 Cal.App.2d 314, 319 [328 P.2d 4]). Obviously a court may allow attorneys' fees on appeal, regardless of which party files the appeal. (*Baldwin* v. *Baldwin* (1946), 28 Cal.2d 406, 418 [170 P.2d 670] ; *Trembath* v. *Trembath* (1954), 124 Cal.App.2d 265, 268 [268 P.2d 208] ; *Frazier* v. *Frazier* (1953), 115 Cal.App.2d 560, 562 [252 P.2d 698].) Indeed, as a rule, costs are chargeable to the husband. (Keezer, "Marriage and Divorce," § 623, pp. 700-701.) Appellant completely fails to demonstrate any abuse of discretion in the allowance of the questioned fees or costs.

We have probed the novel problem of the liability of the putative father for the support of the child he has acknowledged and accepted. We have laid out the lines of possible liability. We are compelled to hold that such liability has not been shown in this record, but we have indicated that, if upon retrial respondent is able to prove an express oral agreement of the putative father to support the child during minority, or if the elements of estoppel against the putative father, as set forth *supra,* are established, the putative father would be liable for such support.

We affirm the order and the judgment in all respects except that portion of the judgment which orders, adjudges and decrees that appellant "pay to . . . [respondent] the sum of Fifty Dollars ($50.00) per month as and for support, maintenance, care and education of the minor child, John Anthony Clevenger," and such portion of the judgment we reverse and remand for further proceedings in accordance with this opinion. Appellant shall pay costs on appeal.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied March 31, 1961.