[No. B010071. Second Dist., Div. Three. Jan. 24, 1986.]

SAMUEL O. REYNOLDS, Plaintiff and Appellant, v.
CITY OF LOS ANGELES, Defendant and Respondent.

## COUNSEL

David Silverton and Loyal A. Weaver for Plaintiff and Appellant.

Ira Reiner and Gary R. Netzer, City Attorneys, John T. Neville, Senior Assistant City Attorney, Philip Shiner and Richard M. Helgeson, Assistant City Attorneys, and Katherine J. Hamilton, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**SUTTON, J.**\*—This is an appeal from a judgment of nonsuit in a wrongful death action. The record on appeal is an agreed statement of the parties per California Rules of Court, rule 6. The litigants urge that it is a case of first impression. The issue presented is very narrowly drawn: Is a surviving "parent" of an "informally" adopted deceased minor child within the class of survivors in Code of Civil Procedure section 377 for purposes of prosecuting a wrongful death action resulting from the accidental death of the minor? The "formality" or "informality" of the adoption procedures in this case determines our answer. We detect no error on the part of the trial court, and affirm.

### PROCEDURAL BACKGROUND AND CONTENTIONS OF THE PARTIES

Samuel O. Reynolds (Reynolds) appeals a judgment of nonsuit rendered September 13, 1984, in a wrongful death action commenced by him following the death of Samuel F. Reynolds (Samuel) who died at age 17 in an

---

\*Assigned by the Chairperson of the Judicial Council.

automobile accident in August of 1979 on a Los Angeles public thoroughfare.

The respondent is the City of Los Angeles (the City). Reynolds' action was filed as WEC 63996 which was consolidated for trial with WEC 64268, another wrongful death case prosecuted by Gerald and Rose McManus, as a result of the death of their daughter who died with Samuel in the same automobile accident.

At the trial the City successfully moved for a nonsuit in Reynolds' case but the McManus case proceeded to trial and a verdict in favor of the City was returned. The jury found that the thoroughfare where the accident occurred was not negligently maintained by the City at the time of the accident. Obviously the nonsuit in Reynolds' case precluded any such verdict in that case.

The basis for the nonsuit was that Reynolds was not the surviving parent of Samuel and was therefore not a person or party empowered to prosecute a wrongful death case within the meaning of Code of Civil Procedure section 377, (hereinafter, section 377).

Reynolds contends he "equitably adopted" Samuel or otherwise entered into an enforceable contract with an English "adoption" court of which Samuel was a third party beneficiary, or that he otherwise enjoyed certifiable status as a lawful parent of decedent within the meaning of section 377, admitting, however, that he did not conclude formal adoption proceedings.

We note initially the potential res judicata or collateral estoppel effect of the judgment in favor of the City in the McManus case, WEC 64268. We also observe the sketchy nature of the agreed statement on appeal and lack of a clerk's record with copies of the pleadings. We only know the date of the fatal accident was August 11, 1979 and that Samuel was a minor age 17, at the time. Who drove the car in the fatal crash is not clear.

FACTS

Samuel O. Reynolds and his wife, Daisy, were a childless "Air Force couple" stationed in England in 1962. Another man in Reynolds' unit fathered Samuel out of wedlock with a local English girl, and during the mother's pregnancy, the Reynoldses arranged to adopt Samuel after his birth. Indeed, they had custody of him from the second or third day of his life. The Reynoldses hired a solicitor in England to initiate local adoption proceedings. Exhibit "C" to the agreed statement on appeal is a copy of what purports to be a dated but unsigned English legal form which, from a

fair reading of it, simply seems to have placed Samuel in the Reynoldses legal custody "pending adoption."

Exhibit "C," in the last typed entry thereon, makes reference to a "20th December 1962 Witney County Court [Provisional Adoption Order]" next to the printed block on that form which states: "Date of adoption order and description of court by which made." If there was a provisional adoption order made, whatever that may have been, no copy of such a provisional adoption order appears in the record.

The dispositive language of exhibit "C" is set forth with an attempt to "line through" the inapplicable portions of it, as it was originally prepared, and as it appears in the record, as follows: "It is ordered ~~that the applicant(s) be authorised~~ [sic] ~~to adopt the infant~~ [or that the applicant(s) be authorised [sic] to remove the infant from Great Britain for the purpose of adopting him/~~her~~ under the law of or within the country in which the ~~applicant is~~/applicants are domiciled and that the applicant(s) do have the custody of the infant pending his/~~her~~ adoption as aforesaid]."

The effect of exhibit "C" to the agreed statement seems clearly interlocutory in nature, and just as clearly implies that the British court was conferring custody of the child on the Reynoldses only for the purpose of their formal adoption of the child at a later date.

However, exhibit "D" of the agreed statement, (p. 1) appears to be a birth certificate replete with "officialese" numbers and seal, for "Samuel Frederick Reynolds; Boy; (Born) 20th January, 1962; (at) Cheltenham . . . ." And page 2 of the exhibit "D" appears to be a copy of the certified copy of an entry in the records of the general register office, which again notes the (missing) provisional adoption order of the 20th of December 1962—Witney County Court, and this entry on "the adopted children register" was "sealed" and dated January 14, 1963, in accordance with the Adoption Act of 1958 (7 Eliz. 2, ch. 5) section 20.

No further or additional legal action whatsoever seems to have been taken in Great Britain or the United States by the Reynoldses to formalize Samuel's adoption thereafter. The Reynolds family eventually returned to the United States with Samuel; resided a while in Oklahoma; and, apparently after completion of 20 years active duty in the Air Force, Mr. Reynolds retired and the family moved to Los Angeles. Mrs. Daisy Reynolds died in 1976, and Mr. Reynolds was the sole surviving "parent" of Samuel at the time of his accidental death. Upon reentry to the United States Mr. Reynolds did apply for and received a "permanent resident" visa from the Department of Immigration and Naturalization for Samuel.

In two legal proceedings prior to the case at bar, Reynolds held himself out to be the natural parent of Samuel. Reynolds v. Carle (SOC 39031) was a dog bite case in which Reynolds, for ostensible appointment as guardian ad litem, asserted that he was the natural parent of Samuel. In re Estate of Samuel F. Reynolds (WEP 13583) was ostensibly Samuel's probate proceeding in which Reynolds, likewise, asserted he was the natural parent of Samuel in the attempt to obtain certain pension rights of the deceased Mrs. Reynolds. In this case, the trial court judicially noted both previous legal proceedings but refused to be bound by any res judicata effect therefrom since the verified assertions of Reynolds being a natural parent were essentially either ex parte or uncontested.

## ISSUES

Reynolds contends on appeal: (1) That Reynolds and his wife, Daisy, entered into a third party beneficiary contract with the English "adoption" court for the benefit of Samuel; (2) that the Reynoldses "equitably adopted" Samuel; and (3) under section 377, Reynolds is an heir at law of Samuel.

The City asserts: (1) Reynolds is not a permissible party under section 377 and cannot prosecute a wrongful death action; (2) equitable adoption, as that doctrine is recognized in California, covers situations where a "parent" dies without formalizing a "child's" adoption, and the "child" is deemed "equitably adopted" in order to obtain an intestate's share of the "parent's" estate.

## DISCUSSION

*Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115 [115 Cal.Rptr. 329 524 P.2d 801, 68 A.L.R.3d 1204], is the case which prompted the last flurry of legislative activity regarding section 377. Steed was the traditional "hard case" where the plaintiff in the wrongful death action was a minor who was born out of wedlock to Steed's wife prior to his marriage to her. The child knew no father in her life other than Steed, but she was never formally adopted by him during his lifetime. Steed died in a commercial airline crash leaving his spouse and another legitimate child by his spouse as survivors. Both the wife and legitimate child were permitted to pursue a section 377 wrongful death action. The child whom Steed did not adopt was not allowed to sue for wrongful death. *Steed* was a split decision of the Supreme Court, four to three. To ameliorate the harsh effect of the *Steed* case, the Legislature, in 1975, amended section 377 and in doing so, made an announcement of its intent to include "dependent stepchildren" within the class of survivors established by section 377. (Stats. 1975, ch. 334, § 2, p. 784.) This leaves us with a situation where a surviving dependent stepchild may sue

for wrongful death, but does not announce any legislative intent on the novel claim of the right of the surviving stepparent or pseudo adoptive parent to sue as an heir for the death of a dependent stepchild or inchoately adopted child.

In *Hazelwood* v. *Hazelwood* (1976) 57 Cal.App.3d 693, at pages 697-698 [129 Cal.Rptr. 384], the question of the dependency of a parent as a section 377 plaintiff was examined. It was held that even under the 1975 amendments to that section, a parent would have to demonstrate a measure of financial dependency or actual or anticipated financial support from decedent child to fit within the class of parties covered by section 377. (See also *Riley* v. *California Erectors, Inc.* (1973) 36 Cal.App.3d 29 32 [111 Cal.Rptr. 459 69 A.L.R.3d 1033], where a mother's judgment for wrongful death of her son [on his 21st birthday] was allowed to stand, and it was stated: "A parent . . . may recover damages for the loss of [her] child's comfort and society and subsequent protection which the child may afford the parent, *provided these elements are considered in reasonable relation to pecuniary loss. . . .*") (Italics ours.) Thus, a significant question presents itself as to Reynold's "dependency" on Samuel as the basis for his maintenance of a section 377 lawsuit.

Reynolds urges *Estate of Bauer* (1980) 111 Cal.App.3d 554 [168 Cal.Rptr. 743], as the most recent California case to affirm the existence of the doctrine of equitable adoption, although in *Bauer,* no such adoption was established. The "keystone" of the doctrine seems to rely upon an oral executed contract in which the "parents" and "child" agree the child should be adopted, and the child performs the contract which results in a species of equitable estoppel. When performed, and such a contract is determined to exist, "justice and equity decree that the adoptive relationship must necessarily exist."

 However, the equitable adoption doctrine connotes a consensual agreement between parties not otherwise incapacitated from entering into a contract. (*Bauer, supra,* cites *Estate of Radovich* (1957) 48 Cal.2d 116 [308 P.2d 14]; *Estate of Rivolo* (1961) 194 Cal.App.2d 773 [15 Cal.Rptr. 268]; and *Estate of Reid* (1978) 80 Cal.App.3d 185 [145 Cal.Rptr. 451].) In each of the cases relied on in *Bauer,* the adult "child" who was being adopted was invariably old enough to consent and agree to be adopted, and to abide in that capacity, although formal adoption proceedings were never undertaken. ██ ██ ██ It is obvious that Samuel at two or three days of age was incapable of entering such contract.[1] We hold the line of Cali-

---

[1]The agreed statement in the case states Samuel never knew he was not the natural issue of the Reynoldses. We are sensitive to the fact that abundant opportunity at relatively mod-

fornia cases cumulating in *Bauer* to be inapplicable to this case, since at the time "the contract was made" Samuel was incapable of entering into such a contract and the record is bereft of any intimation such a "contract" was ever later entered into at an age when Samuel could have comprehended it.

Reynolds urges that there was a third party beneficiary contract for Samuel's benefit formed when the Reynoldses "agreed with the court in Great Britain" to undertake formal adoption proceedings at a future date in some distantly removed but competent jurisdiction. However, Reynolds apparently ignores the mechanics of the third party beneficiary contract. Civil Code section 1559 states: ". . . [A] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Without struggling through the subliminal question of whether Samuel was a "creditor" or a "donor" beneficiary, or merely an "incidental" beneficiary without right to enforce the contract made only incidentally for his benefit, and without indulging in a statute of limitations problem analysis, suffice it to say that the whole idea of a beneficiary contract, and the novel aspect of it in English and American law, is that it is a device where a beneficiary can enforce a promise against the promisor at any time before the promisor rescinds the contract. The right to enforce the contract, if any, would have belonged to Samuel (or possibly to Samuel's estate). Because the Reynoldses undertook no formal adoption proceedings in the United States, and because they did not complete the adoption proceedings that had been commenced in Great Britain, as to Samuel "the contract" remained executory during his lifetime. The "contract" (if there was one) may never have been rescinded during Samuel's too brief 17 years, but any ability or right as a third party beneficiary to enforce such a "contract" expired with Samuel at the time of his death.

It is necessary next to analyze Reynolds' claim that Reynolds is an heir at law of Samuel's under the standard provisions of the Probate Code, thus a survivor capable of maintaining suit under section 377.

Recall that Samuel's death occurred August 11, 1979. "Old" Probate Code section 225 provides: "If the decedent leaves neither issue nor spouse,

---

erate expense existed for the Reynoldses formally to adopt Samuel at a time when, as a toddler, he would have had no knowledge of the significance (or probable recollection) of formal adoption proceedings. During Samuel's life, however, the Reynoldses passed a point of no return when Samuel would have been old enough to comprehend such proceedings, so that "to protect the secret" the Reynolds may intentionally have left well enough alone and intentionally declined to formalize the adoption proceedings. We note, also, that at Samuel's death at 17 he would still not have been an adult with legal capacity to contract, although a minor certainly may contract for the necessaries of life, and we presume, without further comment, that familial "support and maintenance" should qualify as a "necessaries-of-life" exception.

the estate goes to his parents in equal shares, or if either is dead to the survivor, . . ." (The statute was repealed in 1983 operative on Jan. 1, 1985, to be replaced by "new" Prob. Code, § 6414, which will apply only to deaths which occur after Jan. 1, 1985.)

Mr. Reynolds survived his wife, Daisy, and survived Samuel. He alone would have succeeded to any estate of Samuel's if he was in fact a lawful parent of Samuel at the time of Samuel's death.

It is necessary therefore to look at "old" Probate Code section 255, subdivision (c) which was in effect at Samuel's death, which provides: "The rights of succession to a child's estate by a parent and all persons who would take an intestate share of the decedent's estate through such parent, as set forth in this division, are dependent upon the existence, prior to the death of the decedent, of a parent and child relationship between the parent and the deceased child."

A parent and child relationship is legally defined in Civil Code section 7001, a statute which is part of the "Uniform Parentage Act," as follows: "'[P]arent and child relationship' means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes the rights, privileges, duties, and obligations. It includes the mother and child relationship and the father and child relationship."

This, essentially, is the whole case. Was there a legally cognizable parent/child relationship between Reynolds and Samuel? Unquestionably Samuel never knew parents other than the Reynoldses, nor, if we are to believe the record, Samuel never knew the Reynoldses were not his natural parents. Reynolds obviously knew Samuel was not his natural son. At best, Reynolds was the "putative" father of Samuel (e.g. the incompleted British proceedings lent a "color of right" to the adoption).

In *Clevenger* v. *Clevenger* (1961) 189 Cal.App.2d 658, [11 Cal.Rptr. 707 90 A.L.R.2d 569], if the rule of that case were applied to the Reynoldses, had they divorced, the senior Reynolds would no doubt have been estopped to deny a duty of support to Samuel. But *Clevenger* was a situation where the mother was the natural parent of the "adopted" child. Here "the consideration" for acknowledging the support for a wife's natural illegitimate offspring is absent, since neither of the Reynoldses was Samuel's natural parent. As "adoptive parents" Mr. and Mrs. Reynolds may have agreed between themselves expressly or implicitly to support Samuel, but the "detriment" of a putative father supporting a wife's natural illegitimate child is missing. Likewise, the assertion that under "old" Civil Code section 230, now reenacted since 1975 in the "Uniform Parentage Act" as Civil Code

section 7004, subdivision (a)(4), a parent-child relationship by "public acknowledgment" can be established after a child's birth upon the marriage of the parents (which is not the case here) and thereafter where the father ". . . receives the child into his home and openly holds out the child as his natural child." Even if Civil Code section 7004, subdivision (a)(4) were applicable here, the use of that statute would only create a rebuttable presumption of paternity. The statute obviously necessitates the child's mother to be a natural parent, a circumstance which was clearly not the case with Mrs. Reynolds.

Thus under section 377, subdivision (b) and under the further admonition of the *Steed* case, *supra,* 12 Cal.3d 115, that *only* persons who come within the literal application of section 377 may prosecute an action for wrongful death, Reynolds is not a parent within the meaning of either "old" Probate Code section 225 or "new" Probate Code section 6414, since the Reynoldses were neither the natural parent(s) of Samuel nor did they ever conclude formal adoption proceedings. Under section 377 subdivision (b)(2) Reynolds was not ostensibly a dependent of Samuel's, nor was he a putative spouse or stepchild of Samuel's, just as Samuel was obviously not Reynolds' parent. Mr. Reynolds, under 377, subdivision (b)(3) was likewise no minor dependent of Samuel's, and under all classifications in section 377 Mr. Samuel O. Reynolds never qualified as an heir in order to prosecute the wrongful death action. If there had been formal adoption, as there was not, obviously our decision would be the exact opposite.

The judgment is affirmed.

Danielson, Acting P. J., and Arabian, J., concurred.