IN RE the MARRIAGE OF: John T. ULRICH, Jr.,
Petitioner-Appellant-Cross-Respondent,†

v.

Catherine A. CORNELL, Respondent-Cross-Appellant.

Court of Appeals

*No. 90–1220. Submitted on briefs January 2, 1991.—Decided
April 16, 1991.*

(Also reported in 469 N.W.2d 890.)

† Petition to review granted.

For the petitioner-appellant-cross-respondent the cause was submitted on the briefs of *Warmington & Warmington, S.C.* by *Thomas E. Warmington* of Waukesha.

For the respondent-cross-appellant the cause was submitted on the briefs of *Glembocki & Masson, S.C.* of Milwaukee.

Before Moser, P.J., and Sullivan and Fine, JJ.

MOSER, P.J. This case involves both an appeal and cross-appeal from the trial court's postjudgment order which held that John T. Ulrich (John) was estopped from denying an obligation to support Jesse Cornell (Jesse), his stepson. The trial court's order further held that Jesse's change in residence from John's home to that of his mother's, Catherine A. Cornell (Catherine), was an adequate justification for a reduction in Catherine's child support payments to John. The order permitted Catherine to stop paying John $75 per month in support, and ordered him to pay Catherine $10

per week to support Jesse. Finally, the order stated that there was an insufficient basis to award Catherine maintenance for her schooling. Because John is equitably estopped from denying support for Jesse, because there was a change of circumstances warranting elimination of Catherine's support payments for the two children of the marriage, and because John's ability to pay support was limited, it was proper to limit the support of Jesse to $10 per week. The trial court also properly denied Catherine's request for maintenance. We affirm.

## FACTUAL HISTORY

Catherine was unmarried on July 27, 1977, when she gave birth to Jesse. A paternity action to determine Jesse's biological father was underway when Catherine married John on January 20, 1979. In agreement with John, Catherine filed for a termination of the parental rights of Jesse's natural father. John paid the legal expense for the termination of parental rights proceedings. The termination was ordered by Waukesha county circuit Judge Robert T. McGraw on July 27, 1980. On that same day, John signed a petition for the adoption of Jesse, however, the adoption procedure was never completed due to the financial constraints of the parties. Catherine testified that John had said he would adopt Jesse, and that she would never have sought the termination of Jesse's natural father's parental rights if John had not agreed.

During Catherine's and John's marriage, two children were born. Throughout the marriage John treated Jesse as his son and introduced him as such. During this time John also openly and publicly expressed his intent to support Jesse until he was eighteen years of age.

465

The divorce proceedings were held on April 15, 1986, and it was agreed that all three children would live with John. No support payments were ordered at the time of the divorce judgment and Catherine was given extensive visitation rights. The trial court subsequently ordered Catherine to pay $75 per month in child support and held maintenance for Catherine open, but did not order any to be paid. Jesse lived with John from the date of the divorce judgment until July of 1987, a period of fifteen months, when John returned Jesse to Catherine because of disciplinary problems. Catherine continued to pay the monthly $75 for child support, but did not receive any support from John for Jesse.

John filed an order to show cause on April 7, 1989, for additional child support from Catherine and to eliminate maintenance which had been left open in the divorce judgment. Catherine then filed an order to show cause on April 28, 1989, asking most significantly, for a decrease in child support payments to John, for John to pay her child support for Jesse, and for maintenance to help her defray educational expenses. On May 8, 1989, Assistant Family Court Commissioner Joan Hicks held a hearing on these issues and rendered her decision on September 15, 1989. The family court commissioner revised visitation for the two minor children of the marriage, denied John's request for increased support payment from Catherine, denied Catherine's request for decreased support for the two children of the marriage and her request for support for Jesse, and, finally, denied maintenance but held it open for future determination. The commissioner held that there was no change of circumstances warranting reduction in Catherine's $75 per month support payments and that the same was true on the issue of maintenance. The commissioner refused to

employ equitable estoppel on Catherine's request for support for Jesse.

Catherine timely filed for a de novo review, and the trial court held a hearing on December 18, 1989. The trial judge rendered his opinion from the bench that day which was later reduced to writing and entered. The trial court held that John was equitably estopped from not supporting Jesse because he was instrumental in the termination of the parental responsibility of the putative father and unequivocally stated throughout the marriage that he would support Jesse. The court noted that Catherine had relied on these statements to her detriment. The trial court suspended the $75 per month support payment flowing from her to John for the support of the two children of the marriage, and ordered John to pay her $10 per week in support for Jesse because it held Catherine had a change of circumstances since Jesse was now living with her. It further denied maintenance to Catherine.

## ISSUES

John first argues that the trial court erred in ordering him to pay support for Jesse because it did not have subject matter jurisdiction to do so, and there is no law in the state which permits such an award. John also argues that the trial court erred in relieving Catherine of the responsibility to pay child support. John's brief does not cite to any authority to support his argument to reverse the trial court order holding open maintenance. We, therefore, will not address this issue.[1]

---

[1]*See In re Balkus,* 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985).

In response, Catherine argues that the trial court does have subject matter jurisdiction to order John to pay child support for Jesse, and that he is equitably estopped from denying such responsibility. Catherine also argues that the trial court erred in ordering John to pay her just $10 a week in child support, and that it should also have awarded her maintenance.

## SUBJECT MATTER JURISDICTION

■ John contends that the trial court lacks subject matter jurisdiction whereby to order him to pay support for Jesse. The record reflects no indication that this issue was raised before the trial court. This court has held that the "[f]ailure to timely object to the court's competency to proceed constitutes a waiver of that objection."[2] This issue is waived.

## EQUITABLE ESTOPPEL

John argues that there is no statute or common law provision in our state that permits a trial court to order an individual to provide child support for the child of an ex-spouse who is not legally that person's child. That is to say, that the person ordered to pay support is not either the natural or adoptive parent of the child. We hold that the trial court was correct in ordering John to pay support for Jesse under a theory of equitable estoppel.

The doctrine of estoppel has been thoroughly entrenched in our system of jurisprudence for many years. Although estoppel by some "has sometimes been quaintly defined [as] stopping a man's mouth from

[2] *Wall v. DOR,* 157 Wis. 2d 1, 7, 458 N.W.2d 814, 816 (Ct. App. 1990).

speaking the truth; and would seem, in some measure, to partake of severity, if not of injustice,"[3] this is far from the truth. In fact, estoppel:

> is in reality founded upon the soundest principles, as a rule of evidence. That a party has, by his own voluntary act, placed himself in a situation as to some matter of fact, that he is precluded from denying it; and in its application to the dealings and contracts of men in the affairs of human life, it is a salutary practical rule, that a man shall not be permitted to deny what he has once solemnly acknowledged.[4]

On review, the trial court's application of the doctrine of equitable estoppel to a case involving child support is a question of law.[5] Questions of law are decided independently by appellate courts without giving deference to the trial court.[6]

In *A.M.N. v. A.J.N.*, this court held that for a trial court to employ the doctrine of equitable estoppel in stepparent child support cases requires finding: "(1) an unequivocal representation of intent to support the child; (2) reliance on that representation by the natural parent or child; and (3) detriment to the natural parent or child as a result of such reliance."[7] In *A.M.N.* the stepparent was not ordered to pay child support because he had only promised to love the child, not to support it,

---

[3] *Sprigg v. Bank of Mount Pleasant,* 35 U.S. (10 Pet.) 257, 265 (1836).

[4] *Id.*

[5] *A.M.N. v. A.J.N.,* 141 Wis. 2d 99, 103, 414 N.W.2d 68, 70 (Ct. App. 1987).

[6] *Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

[7] *A.M.N.,* 141 Wis. 2d at 105, 414 N.W.2d at 71.

so equitable estoppel was not applied to enforce child support payments.[8]

A number of other jurisdictions have likewise held that under the proper set of circumstances the doctrine of equitable estoppel is available as a means for making a stepparent pay child support.[9] In analyzing the public policy aspects of this decision, the California Court of Appeals said that:

There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child. If any legal hypothesis can prevent such an inducement to publication of illegitimacy, we should adopt that theory. We therefore examine each of the approaches suggested by respondent, and, although we do not believe this record sustains their application here, we point out that if the facts would establish an express agreement for the maintenance of the child or an estoppel as to the child, as we explain it,

[8]*Id.* at 105–06, 414 N.W.2d at 71.

[9]*See Clevenger v. Clevenger,* 11 Cal. Rptr. 707, 710 (Cal. Dist. Ct. App. 1961) (all the elements for estoppel were not present); *Knill v. Knill,* 510 A.2d 546, 551 (Md. 1986) (stepparent was not estopped from not paying child support because the element of detriment was not shown); *Miller v. Miller,* 478 A.2d 351, 359 (N.J. 1984) (the case was remanded for a factual determination of whether the elements of estoppel were present); *Mace v. Webb,* 614 P.2d 647, 649 (Utah 1980) (in dictum, the Utah Supreme Court noted that if the proper facts existed a stepparent could be estopped from not paying child support).

the husband would be liable for the child's support.[10]

There have also been instances where a court at the request of a stepparent has applied estoppel to prohibit the natural parent from denying that the stepparent was legally a parent to the natural parent's child.[11] This court has held that given the proper circumstances equitable estoppel may be used by the stepparent.[12]

There are several jurisdictions that have explicitly held stepparents liable for support.[13] It should be noted that such action should be taken cautiously so as not to deter voluntary support from a stepparent.[14]

In this case, John admitted that he had hired and paid for the attorney that handled the termination of parental rights proceedings absolving any putative father from the obligation of supporting Jesse at any time in the future. Thus, J.H. the alleged natural father, who

[10]*Clevenger,* 11 Cal. Rptr. at 710.

[11]*Atkinson v. Atkinson,* 408 N.W.2d 516, 519–20 (Mich. Ct. App. 1987); *In re Adoption of Young,* 364 A.2d 1307, 1312–13 (Pa. 1976).

[12]*In re D.L.H.,* 142 Wis. 2d 606, 613–17, 419 N.W.2d 283, 286–87 (Ct. App. 1987).

[13]*See Johnson v. Johnson,* 152 Cal. Rptr. 121, 122 (Cal. Ct. App. 1979); *Wade v. Wade,* 536 So. 2d 1158, 1160 (Fla. Dist. Ct. App. 1988); *Nygard v. Nygard,* 401 N.W.2d 323, 326–27 (Mich. Ct. App. 1986); *M.H.B. v. H.T.B.,* 498 A.2d 775, 780 (N.J. 1985); *Wener v. Wener,* 312 N.Y.S. 815, 818 (N.Y. App. Div. 1970); *Manze v. Manze,* 523 A.2d 821, 824–25 (Pa. 1987); *T. v. T.,* 224 S.E.2d 148, 152 (Va. 1976); *K.T. v. L.T.,* 387 S.E.2d 866, 872 (W.Va. 1989); *see also* 1 H. Clark, *The Law of Domestic Relations in the United States* sec. 7.2, at 442–43 (2d ed. 1987); 1 B. Frank, T. Walker, K. Raggio, L. Becker, M. Melli, W. Nagan, G. Raggio, W. Garrett, A. Charlow & A. Stanton, *Alimony, Child Support & Counsel Fees—Award, Modification & Enforcement* sec. 11.04[2][c][i] (1988).

[14]*See Miller,* 478 A.2d at 358.

was present at the termination of parental rights hearing, is forever excused from the obligation of financial support for the child Jesse, to the detriment of Catherine. The same day the termination proceeding concluded, John had formal adoption papers drawn up for his adoption of Jesse. The uncontroverted testimony in the record is that Catherine would not have terminated the putative father's parental rights but for the fact that John was going to adopt Jesse. It is further uncontroverted that by terminating the putative father's parental rights, Catherine cannot seek future support from the natural father because "[a]n order terminating parental rights permanently severs all legal rights and duties between the parent and the child."[15]

It is not disputed that throughout the marriage of the parties, John, at all times, openly held out to the public at large that he was Jesse's father and would support him until he reached adulthood. In fact, after the divorce, when Jesse lived with John, John registered Jesse, under the name "Jesse Ulrich," at Trinity Lutheran School as his son. It was not until more than a year after the divorce, when Jesse became a disciplinary problem for John and his second wife, that John returned Jesse to Catherine. Only subsequent to the return of Jesse to Catherine, when support became an issue between John and Catherine, did John, for the first time, give notice that he no longer considered Jesse his child. We hold that these facts meet the test of equitable estoppel in that there were unequivocal representations by John of his intent to support Jesse. There was reliance on those representations by Catherine to her detriment as a matter of law.

---

[15]*See* sec. 48.43(2), Stats.

Catherine contends that the trial court abused its discretion when it ordered John to pay $10 per week in support for Jesse. She believes that given her's and John's comparative incomes that the trial court should have ordered a larger support payment. Child support may be modified only when "a substantial or material change" has taken place in the circumstances of those involved.[16] Modification is a decision within the trial court's sound discretion,[17] and its decision will stand unless an abuse of that discretion can be shown.[18]

In its decision from the bench, the trial court stated that:

> The question of changing the support order, the court does recognize that at this time Mr. Ulrich has a family of five—you have a wife and three children.
>
> . . ..
>
> . . . The court will suspend the support flowing from Miss Cornell to Mr. Ulrich, will give her an increase to her budget, she was ordered to pay $75 a month. She will have that, he will not have it. He will pay the sum of $10 a month over and above that to Miss Cornell. The court is fully aware of the fact that $10 seems to be a very small amount. That will be child support flowing from Mr. Ulrich to the child Jesse.
>
> There has been very little testimony on this record about the standard of living of the minor child prior to the time of the granting of the divorce, but

---

[16]*Thibadeau v. Thibadeau,* 150 Wis. 2d 109, 114, 441 N.W.2d 281, 283 (Ct. App. 1989); *see* sec. 767.32(1), Stats.

[17]*Thibadeau,* 150 Wis. 2d at 115, 441 N.W.2d at 283.

[18]*See Poehnelt v. Poehnelt,* 94 Wis. 2d 640, 649–50, 289 N.W.2d 296, 300–01 (1980).

the court takes into consideration the fact that only $75 was ordered to flow from Miss Cornell to Mr. Ulrich for her contribution towards the support of the three children in the custody of Mr. Ulrich. The court in gleaning everything possible from this record, can only find that a $75 per month contribution flowing in one sense from Mr. Ulrich—he no longer receives and $10 out his pocket which he must pay, should allow along with whatever help is coming from Miss Cornell for the child Jesse, should allow the maintaining of a level of support for Jesse just about equal to that which was enjoyed during the course of the marriage and the household keeping between Mr. Ulrich and at the time Mrs. Ulrich, which at this time would be Miss Cornell. The record is not as clear as the court would like for it to be, but on this record, this is the best record that this court can make for its reasoning here.[19]

█

We note that the trial court did not abuse its discretion in ordering the child support it did. The trial court reasonably analyzed the facts and pertinent law of this case and appropriately justified its ruling in a rational manner.[20] He carefully considered both parties change of family and financial circumstances and their respective abilities to pay support and thus properly modified the support obligation of both parties.[21] Catherine's assertion that the trial court abused its discretion and failed to award her adequate support for Jesse is without sufficient grounds.

---

[19]The trial court later corrected itself and stated that it meant to say that John's support for Jesse should be $10 per week, not $10 per month.

[20]See Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20 (1981).

[21]See sec. 767.32(1), Stats.

## MAINTENANCE

Just as with the trial court's determination of how much child support to award, the trial court's determination of maintenance, for purposes of educating Catherine, is affirmed. The trial court did not abuse its discretion because it rationally considered the law and facts involved and stated its reasoning for the conclusions reached.[22] The trial court stated that:

> On the question of contribution towards educational fees for the supplying of money to Miss Cornell by Mr. Ulrich, in order to allow Miss Cornell to finish her educational concerns at MATC, the testimony [sic] presented in that cause does not reach the level of the requirement of the testimony as given or the facts as given in Lundberg versus Lundberg, 107 Wis. 2d, page 1, [318 N.W.2d 918 (1982)] a 1982 case. There are a number of other cases that the court believes to be pertinent including Roberto versus Brown at 107 Wis. 2d, page 17 [318 N.W.2d 358 (1982)].
>
> The court cannot find that in any manner Mrs. Ulrich denied or neglected her educational opportunities during the course of this seven year marriage with Mr. Ulrich in order for Mr. Ulrich to obtain an education or to further his economic opportunities or advancement in his life. The court cannot find in this testimony any denial of educational benefits to the present Miss Cornell who is the former Miss [sic] Ulrich for the benefit of supporting and undergirding or underpinning the economic and educational opportunities of Mr. Ulrich. Therefore, any request for contribution in the form of maintenance flowing from Mr. Ulrich to Miss Cornell for the purpose of

[22]*Enders v. Enders,* 147 Wis. 2d 138, 142, 432 N.W.2d 638, 639–40 (Ct. App. 1988).

educational benefits, are not sustained by the evidence presented to the court and therefore must be denied.

The order of the trial court should be affirmed.

*By the Court.*—Order affirmed.

FINE, J. *(dissenting)*. In Wisconsin, actions affecting the family, as defined by section 767.02(1), Stats., are governed by statute. *See* Chapter 767, Stats.; *Siemering v. Siemering*, 95 Wis. 2d 111, 113, 288 N.W.2d 881, 882 (Ct. App. 1980). A proceeding to compel payment of child support is an action affecting the family. Section 767.02(1)(f), Stats. By statute, only "parents" are liable for child support. *See* sec. 767.25(1)(a), Stats. ("Whenever the court . . . enters an order or a judgment in [a child-support] action under s. 767.02(1)(f) or (j) or 767.08, the court shall . . . [o]rder either or both *parents* to pay an amount reasonable or necessary to fulfill a duty to support a child.") (Emphasis added.)

Section 767.08(2)(a), Stats., details the procedure by which a parent can be compelled "to provide for the support and maintenance of his or her . . . minor child." Thus, and with critical significance here, under our current statutory scheme no court in Wisconsin may order a person to support a minor unless that person is the minor's parent, either by conception, adoption, adjudication, or—in the case of a man married to the minor's mother when the minor was conceived or born—presumption. Section 767.45(5m), Stats. Section 767.45(5m) is mandatory and unambiguous:

> Except as provided under 767.458(3) [governing situations where a man has filed "a statement acknowledging paternity"], unless a man is either presumed the child's father under s. 891.41 or adjudi-

cated the child's father either under s. 767.51 or by final order or judgment of a court of competent jurisdiction in another state, *no order* or temporary order *may be entered for child support,* legal custody or physical placement until the man is adjudicated the father using the procedure set forth in ss. 767.45 to 767.60. *The exclusive procedure for establishment of child support obligations,* legal custody or physical placement rights *for a man who is neither presumed the child's father under s. 891.41 nor adjudicated the father is by an action under ss. 767.45 to 767.60. No person may waive the use of this procedure.* If a presumption under s. 891.41 exists, a party denying paternity has the burden of rebutting the presumption.

(Emphasis added.) John T. Ulrich, Jr., upon whom both the trial court and the majority have placed an obligation of child support, does not come within section 767.45(5m)'s reach. He has not filed "a statement acknowledging paternity" under section 767.458(3), Stats. Section 767.45(5m). He has not been "adjudicated the child's father under s. 767.51." *Ibid.* He has not been adjudicated the child's father "by final order or judgment of a court of competent jurisdiction in another state." *Ibid.* He has not been adjudicated the child's father "using the procedure set forth in ss. 767.45 to 767.60." *Ibid.* Nor is he someone to whom the presumption of paternity under section 891.41, Stats., would apply. *See ibid.*

Under section 891.41, Stats. (1989-90):

A man is presumed to be the natural father of a child if any of the following applies:

(1) He and the child's natural mother are or have been married to each other and the child is conceived or born after marriage and before the

*granting of a decree of legal separation, annulment or divorce between the parties.*

(2) He and the child's natural mother were married to each other after the child was born but he and the child's natural mother had a relationship with one another during the period of time within which the child was conceived and no other man has been adjudicated to be the father or presumed to be the father of the child under sub. (1).

Although Ulrich and Catherine Cornell were married to one another, the child was not "conceived or born after [the] marriage," which is the prerequisite to applying the presumption of paternity under section 891.41(1).[1]

Estoppel, the mechanism by which the majority imposes child-support obligations on Ulrich in direct contravention of section 767.45(5m), Stats., is a doctrine that, in essence, prevents a party from asserting either the truth or that which the law deems to be the truth. 2

---

[1]Section 891.41(2), Stats., was recreated in its present form by 1989 Wis. Act 212 section 28, effective April 28, 1990. 1989 Wis. Act 212 sec. 32. Section 891.41(2) is thus not applicable to this proceeding, which was commenced prior to April 28, 1990. *See* 1989 Wis. Act 212 sec. 31. In any event, although Ulrich and Cornell "were married to each other after the child was born," there is no evidence in the appellate record that they "had a relationship with one another during the period of time within which the child was conceived," which is the prerequisite to applying the presumption of paternity under the current version of section 891.41(2).

Section 891.41(2), as it existed prior to the commencement of this proceeding, is also not applicable to Ulrich. That subsection provided that "[a] man is presumed to be the natural father of a child if . . . [h]e has acknowledged his paternity of the child under s. 69.15(3)(b)1 or 3 and sub. (1) [of section 891.41] does not apply to any other person." Section 891.41(2), Stats. (1987–88).

E. Coke, *The First Part of the Institutes of the Laws of England; A Commentary Upon Littleton* sec. 667 (15th ed. London 1794);[2] *Sprigg v. The Bank of Mount Pleasant,* 35 U.S. (10 Pet.) 257, 265 (1836). Thus, for example, although section 891.41 establishes circumstances for the application of a presumption of paternity, none of which apply in this case, this presumption may be rebutted. Section 767.45(5m) ("If a presumption under s. 891.41 exists, a party denying paternity has the burden of rebutting the presumption."); *see also* Rule 903.01, Stats.; *Strawser v. Strawser,* 126 Wis. 2d 485, 491, 377 N.W.2d 196, 199 (Ct. App. 1985). The doctrine of estoppel may be used, in appropriate circumstances, to preclude a party against whom the presumption applies from *rebutting* the presumption. *See A.M.N. v. A.J.N.,* 141 Wis. 2d 99, 103, 414 N.W.2d 68, 70 (Ct. App. 1987); *see also In re D.L.H.,* 142 Wis. 2d 606, 613–618, 419 N.W.2d 283, 286–288 (Ct. App. 1987) (if circumstances appropriate, equitable estoppel could be applied to prevent wife from rebutting presumption that husband was father of child born during the marriage—section 891.41 not specifically discussed). Neither *A.M.N.* and *D.L.H.,* upon which the majority relies, authorize—directly, indirectly, or by implication—imposing support obligations on someone who is not a "parent," either by conception, adoption, adjudication, or statutory presumption. The majority's use of estoppel to create such an obligation where, as here, that is specifically prohibited by statute usurps the legislative function. This is one of those "hard cases" that make "bad law." *See* 3 V.S. Lean, *Collectanea* 479 (1903); *see also Northern Securi-*

---

[2] "*'Eftoppe'* commeth of the French word *eftoupe,* from whence the Englifh word ftopped: and it is called an eftoppel or conclufion, becaufe a man's owne act or acceptance ftoppeth or clofeth up his mouth to alleage or plead the truth."

*ties Co. v. United States,* 193 U.S. 197, 400 (1904) (Holmes, J., dissenting). I respectfully dissent.