[No. D047798. Fourth Dist., Div. One. July 2, 2007.]

COUNTY OF SAN DIEGO, Plaintiff and Respondent, v.
DAVID ARZAGA, Defendant and Appellant.

**COUNSEL**

The Shaw Firm and James Thompson Shaw for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Thomas R. Yanger, Assistant Attorney General, Paul Reynaga, Sharon Quinn and Mary Dahlberg, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**O'ROURKE, J.**—David Arzaga appeals from what he characterizes as a judgment in favor of the County of San Diego (County) finding him to be the legal father of Karen R. under the doctrine of parentage by estoppel. Arzaga contends that the elements of the doctrine were not established by the trial evidence and the court therefore abused its discretion in reaching its finding. County responds that the appeal must be dismissed because the statement of decision from which Arzaga took his appeal is not an appealable order. We disagree with County that the trial court's order is not appealable, and on the

merits conclude a finding of parentage by estoppel in this case is prevented by the trial court's finding that it was "clear that [Arzaga] truly did not know that he was not the biological father and only stopped acting as such when the genetic test results were received in this action." We therefore reverse the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2004, County filed a complaint alleging that Arzaga was the father of Karen, who was born in January 1989. Arzaga denied paternity in his answer, and subsequent DNA testing resulted in a finding that Arzaga was not Karen's biological father.

County subsequently moved for a judgment of parentage, and for an order that Arzaga pay $959 in monthly child support payments and health insurance coverage for Karen. The matter proceeded to trial on the theory of parentage by estoppel, with trial occurring over the course of three days in October and November 2005.

The parties stipulated before trial that Arzaga was not Karen's biological father. At trial, Karen's mother, Maria R.,[1] testified that she met Arzaga in 1985 and they began a dating relationship lasting approximately one year. In 1988, they resumed their relationship for some period of time. Maria became pregnant that year and gave birth to Karen in January 1989. In 1990, Maria and Arzaga again resumed a relationship lasting five years, with Maria and Arzaga staying at each other's houses several days during the week. Maria testified that during this time, Arzaga behaved toward Karen "like her father" and Karen addressed him as "Papi." Arzaga never objected or corrected Karen. County admitted photographs into evidence of Karen and Arzaga and other members of his family during various holidays and Karen's third or fourth birthday. County introduced Christmas cards from Arzaga to Karen when she was eight, nine, 12 and 13 years old in which he signed the card, "Daddy," and referred to Karen as his daughter, or "Mija," which is a Spanish term for daughter. It also introduced copies of four checks dated in March, April and May of 1997, signed by Arzaga and payable to Maria with notations, "for Karen" or "Karen's support" in the memo section. Maria testified Arzaga provided Karen with money at other times, although, it was "not constant"; when he first saw Karen he gave Maria $100, and after 1997, he provided her with money until about 2001. Maria stated Arzaga "was not really supporting [Karen], but when he wanted, he would give her money, $100."

---

[1] Because Maria and Karen share the same surname, we have used their first names throughout the opinion for clarity.

After Maria and Arzaga's relationship ended in 1995, Arzaga continued to visit with Karen; as Maria described it, he would only call and talk to Karen or take her out to eat. She testified Arzaga stopped visiting Karen when she turned 14. Maria testified that at no time did Karen ever ask her whether she had a different father than Arzaga, and she never told Karen that Arzaga was not her father. Maria did not identify Arzaga in school records as Karen's father because she did not want to cause confusion. According to Maria, when Karen was about three or four years old, she and Arzaga started the process of filling out forms for Karen to take Arzaga's name but never completed it—not because Arzaga told her he was not Karen's father, but because they could not locate information about Arzaga's mother or the hospital. It was not because Arzaga told her he was not Karen's father. Maria testified she does not know the identity of Karen's biological father.

When asked about his relationship with Karen, Arzaga testified "I don't know what kind of relationship I really had with her. The only thing I know, I knew her mother, and her mother said that I was daddy. I was a good friend." He testified about how he learned about Karen's birth and Maria's claim that he was her father:

"[Counsel]: . . . When did you first find out that Karen was born?

"[Arzaga]: The time that she called me, she said I want you to come meet Karen. I said, okay, I'll go. When she invited me over after a year.

"[Counsel]: What year was that?

"[Arzaga]: That was the early part of—she was born in '89. It was about a year and three months after she was born that she called me over. And from what I can remember, that's what I remember.

"[Counsel]: And she told you you were the father of the child?

"[Arzaga]: She made it known like I was the father.

"[Counsel]: What did you tell her?

"[Arzaga]: I told her she's not my daughter, because that goes back months. But I saw her and she was a good little kid like a lot of little girls are or little boys. And she really loved her daughter.

"[Counsel]: During the time that you, Karen and Karen's mother lived together, did you engage in any process to change Karen's name to adopt your last name?

"[Arzaga]: Yeah. Well, we were funning around, and I knew she was not my daughter. But we were just funning around and she brought up this paper. Either I got it or she did. I don't remember. I said this is the process you got to do in order to change the name. Do you want me to go on?

"[Counsel]: Go ahead.

"[Arzaga]: But I told her, because of the fact that I didn't know. I said, I'd like to get a blood test. At that time she said, no, you don't have to. And I said okay.

"[Counsel]: What was her reply that there had to be a blood test?

"[Arzaga]: She said, no, it's not necessary. You are the papi, you are the daddy. So I got a good heart and I went along with it.

"[Counsel]: Obviously, there was no blood test.

"[Arzaga]: No, sir."

Arzaga never corrected Maria when she told Karen he was her father because he thought it would be cruel to tell Karen otherwise. Arzaga admitted calling Karen "Mija," but stated he used that term for his wife and sisters as well. He also testified he called Karen "Mija" out of respect. Arzaga could not explain why he labeled his checks as "support"; he stated he was only giving money to Maria just for Karen's school. He also admitted giving Maria $1,000 towards Karen's "Quinceañera," a celebration for a girl's 15th birthday party, which is a Mexican custom. According to Arzaga, his later contacts with Karen were initiated by Maria when she would tell him, "You need to talk to your daughter."

Karen testified that before the County's case commenced, Arzaga never told her he was not her father; that she was raised to think he was her father; and he "always tried to be like a father" to her. Karen described photographs of various holidays and events she had spent as a toddler at the home of Arzaga's mother, whom she referred to as "Nana" or "Grandma," and at the home of Arzaga's sister, whom Karen referred to as "Aunt Olga." She also described photographs taken of her with Arzaga when she was about seven or eight years old, in which they were happy and hugging, and Karen testified she felt comfortable being physically close and hugging Arzaga because she always believed he was her father. She stated it was normal for Arzaga to sign birthday and Christmas cards as "Daddy." According to Karen, though she saw Arzaga less frequently after her seventh birthday, she never had any doubts as to whether or not he was her natural father. On cross-examination, Karen testified Arzaga stopped calling her without explanation in 1998 when she was about nine years old, and she stopped calling him because she was "tired" that he never called her. She still at that time believed Arzaga was her father even though she saw him only once or twice a year. When asked in elementary and junior high school who her father was, she "answered it was David, my dad" or would say she had a father who lived in National City, referring to Arzaga. She called Arzaga "Daddy" and his mother "Nana" or grandma, and he called her "Mija" or "Gordis." Karen testified that she visited with Arzaga's mother twice from 1998 to 2004; she took Karen in as her granddaughter and gave her instructions about sitting up straight. Karen admitted she never used Arzaga's last name; she explained she was never told that was her last name, and her mother told her that Arzaga never finished the paperwork so that she could legally use his last name. Karen repeated that before the trial started, she never had any doubts whatsoever at any time during her life that Arzaga was her father. Arzaga never corrected her when she referred to him as "Daddy," and from 1998 to 2004, he never took her aside and told her he was not her real father. It was not until legal proceedings had started that Arzaga told Karen she should go find her biological father, which disturbed her.

On November 8, 2005, the court issued a statement of decision on the matter. Summarizing the parties' testimony and making express credibility determinations, the court ruled that County carried its burden of proving that Arzaga was Karen's father under the theory of parentage by estoppel. It found Karen to be the most credible witness on the matter, "demonstrated by her words and body language and corroborating evidence entered through other sources." The court observed Karen "constantly referred instinctively to [Arzaga] as her 'Dad' "; that "[h]er nature, the way the words rolled off her

tongue and the references she made it quite clear and convincing to the Court that she honestly believes that [Arzaga] is her father" and that "[u]ntil she was told otherwise in her 16th year, she had no question that [Arzaga] was her father, his mother was her grandmother, his siblings were her aunts and uncles and their kids were her cousins." It found the evidence uncontroverted that Arzaga made support payments from 1989 to 2001. The court stated the evidence showed that while he may have professed otherwise on an odd occasion, Arzaga believed he was Karen's father and "acted accordingly." However, the court found it "clear that [Arzaga] truly did not know that he was not the biological father and only stopped acting as such when the genetic test results were received in this action."

That same day, the court entered a signed minute order stating that the matter was calendared to January 17, 2006, "for child support."[2] Arzaga filed a notice of appeal stating he was appealing from the "judgment after court trial" entered on November 8, 2005.

## DISCUSSION

### I.  *Motion to Dismiss Appeal*

County contends Arzaga's appeal from the trial court's statement of decision is premature and should be dismissed because it was not the trial court's final determination on the merits of the matter. Specifically, County points out the court set a further hearing to determine the amount of Arzaga's child support, and argues because that issue remained outstanding, the statement of decision from which Arzaga appeals was merely interim. We disagree with County that these circumstances render the order nonappealable.

An appealable judgment or order is a jurisdictional prerequisite to an appeal. (Code Civ. Proc., § 904.1; *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 [107 Cal.Rptr.2d 149, 23 P.3d 43]; *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) "California is governed by the 'one final judgment' rule which provides 'interlocutory or interim orders are not appealable, but are only "reviewable

---

[2] A different, unsigned, minute order in the record reads: "The Court continues this matter for the issue of child support [t]o January 17, 200[6,] at 1:45 p.m. in this department. The Court provides a copy of the statement of decision to counsel, and the parties."

on appeal" from the final judgment.' [Citation.] The rule was designed to prevent piecemeal dispositions and costly multiple appeals which burden the court and impede the judicial process. [Citation.] In keeping with this rule, [Code of Civil Procedure] section 904.1 generally authorizes appeals from superior court judgments, except those which are interlocutory. [Citation.] . . . [¶] . . . The decree will not be appealable 'unless it comes within the statutory classes of appealable interlocutory judgments.' " (*Doran v. Magan* (1999) 76 Cal.App.4th 1287, 1292–1293 [91 Cal.Rptr.2d 60].) "Under the basic theory of the one final judgment rule . . . , orders are appealable only when expressly made appealable by statute . . . , or when they are in effect final judgments . . . ." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 111, p. 177.)

■ Here, the Legislature has expressly designated a court's order for parentage in a local agency action for child support as a final determination. When a local child support agency brings an action for support of a child, as here, "[a] final determination of parentage may be made in [the] action . . . as an incident to obtaining an order for support." (Fam. Code, § 17404, subd. (a).)[3] In such a case, the final determination is appealable. (*City and County of San Francisco v. Givens* (2000) 85 Cal.App.4th 51, 53–54, fn. 2 [101 Cal.Rptr.2d 859].) The fact that Arzaga appealed from the trial court's statement of decision does not change our conclusion. Although an informal opinion or decision is not normally an appealable judgment or order, a memorandum of decision may be appealable when signed and filed, and constitutes the trial judge's final judicial determination on the merits. (*Safeway Stores, Inc. v. Brotherhood of Teamsters* (1978) 83 Cal.App.3d 430, 434, fn. 1 [147 Cal.Rptr. 835]; see also *Estate of Lock* (1981) 122 Cal.App.3d 892, 896 [176 Cal.Rptr. 358] ["A memorandum of decision may be treated as an appealable order or judgment when it is signed and filed, and when it constitutes the trial judge's determination on the merits"].) These requirements are met by the court's statement of decision.

---

[3] Family Code section 17404, subdivision (a) provides in full: "Notwithstanding any other statute, in any action brought by the local child support agency for the support of a minor child or children, the action may be prosecuted in the name of the county on behalf of the child, children, or a parent of the child or children. The parent who has requested or is receiving support enforcement services of the local child support agency shall not be a necessary party to the action but may be subpoenaed as a witness. Except as provided in subdivision (e), in an action under this section there shall be no joinder of actions, or coordination of actions, or cross-complaints, and the issues shall be limited strictly to the question of parentage, if applicable, and child support, including an order for medical support. A final determination of parentage may be made in any action under this section as an incident to obtaining an order for support. An action for support or parentage pursuant to this section shall not be delayed or stayed because of the pendency of any other action between the parties."

## II. *The Court's Finding of Parentage by Estoppel Cannot Be Supported by the Evidence*

Arzaga contends the trial court erred in determining he was Karen's father—that County's trial evidence did not establish the elements of parentage by estoppel as set out in *Clevenger v. Clevenger* (1961) 189 Cal.App.2d 658 [11 Cal.Rptr. 707] (*Clevenger*) and its progeny. The contention has merit.

■ In *Clevenger*, the court addressed "the duty of support which a husband owes to his wife's illegitimate child when the husband, from the date of the birth of the child, accepts the child into his family, publicly acknowledges the child as his own and treats the child as if he were legitimate." (*Clevenger, supra,* 189 Cal.App.2d at p. 662.) The court held that under some circumstances, the husband would be estopped from asserting he is not the father of the child to avoid liability for the child's support. (*Ibid.*) To set the foundation for the elements of estoppel, "the facts should show . . . that the husband represented to the [child] that he was his [or her] father, that the husband intended that his representation be accepted and acted upon by the child, that the child relied upon the representation and treated the husband as his [or her] father and gave his [or her] love and affection to him, [and] that the child was ignorant of the true facts . . . ." (*Id.* at p. 671, citing *Safway Steel Products, Inc. v. Lefever* (1953) 117 Cal.App.2d 489 [256 P.2d 32].) The court emphasized that the doctrine was narrowly limited, restricted to cases in which "the putative father . . . represents to the child expressly or by implication that he is the child's natural father and the child believes him to be the natural father." (*Clevenger,* at p. 674.) It explained, "We do not suggest that the husband who supports his wife's child by another man necessarily incurs liability for the support of that child. Here, if the facts so show, we predicate an estoppel upon the child's acceptance of the representation of the putative father that he is the natural father." (*Ibid.*) The *Clevenger* court added a second limitation: "the representation must be of such long continuance that it frustrates the realistic opportunity of discovering the natural father and truly establishes the paternal relationship of the . . . father and the child." (*Id.* at p. 675.)[4]

---

[4] To support its application of estoppel, *Clevenger* reasoned in part: "There is an innate immorality in the conduct of an adult who for over a decade accepts and proclaims a child as his own, but then, in order to be relieved of the child's support, announces, and relies upon, his bastardy. This is a cruel weapon, which works a lasting injury to the child and can bring in its aftermath social harm. The weapon should garner no profit to the wielder; the putative father should earn no premium by the assertion of the illegitimacy of the child. If any legal hypothesis can prevent such an inducement to publication of illegitimacy, we should adopt that theory. . . . [I]f the facts would establish an express agreement for the maintenance of the child or an estoppel as to the child, as we explain it, the husband would be liable for the child's support." (*Clevenger, supra,* 189 Cal.App.2d at pp. 664–665, fn. omitted.)

In *Clevenger*, there was no dispute the wife's husband knew the child was not his own; the child had been conceived when the husband and wife were separated and the husband was in military service. (*Clevenger, supra,* 189 Cal.App.2d at p. 663.) When the husband returned home, he and his wife reconciled and the husband accepted the child into the family, showed affection to him, and acted as a father " 'to the best of . . . [his] ability.' " (*Ibid.*) The *Clevenger* court, however, rejected the theory of parentage of estoppel in that case, because the evidence did not show the husband had ever represented himself to the child as his natural father; there was no finding of a "direct or implied representation to the child that he was the boy's father." (*Id.* at pp. 670–671.) Under these facts, the *Clevenger* court did not focus its attention on the first essential element of estoppel, namely, that "the party to be estopped is apprised of the facts." (*Hughes v. Bd. of Architectural Examiners* (1998) 17 Cal.4th 763, 794 [72 Cal.Rptr.2d 624, 952 P.2d 641]; see also *California Cigarette Concessions, Inc. v. Los Angeles* (1960) 53 Cal.2d 865, 869 [3 Cal.Rptr. 675, 350 P.2d 715]; *Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264]; *Long Beach v. Mansell* (1970) 3 Cal.3d 462, 489 [91 Cal.Rptr. 23, 476 P.2d 423]; *Bisconer v. Billing* (1925) 71 Cal.App. 779, 783–784 [236 P. 329] [citing cases].)

*Clevenger*'s estoppel doctrine has been followed in several cases. In *In re Marriage of Johnson* (1979) 88 Cal.App.3d 848 [152 Cal.Rptr. 121], the court found the *Clevenger* elements of estoppel met in circumstances where the mother and respondent putative father had married 10 days before the child was born and the respondent, who was not the child's biological father, had been at the hospital and held the child when he was born, told the priest at the child's baptism and teachers at the child's school that he was the child's father, and admitted he conducted himself in a manner to cause people to assume he was the child's father. (*Johnson,* at p. 850.) The respondent testified he had never told the child he was not his father and that the child called him "Daddy." (*Ibid.*) The court observed the duration of the parent-child relationship was approximately six years, and that the respondent had assumed the role of the child's father from the moment of his birth and continued to play that role his entire life. (*Id.* at p. 852.) Further, the court held while the respondent had not expressly represented to the child that he was his father, it was "patently clear that his conduct was such that an implied representation to that effect was made and that [respondent] intended [the child] to accept and act upon such representation." (*Ibid.*) The court found it equally clear that the child was ignorant of the true facts and gave

respondent his love and affection. (*Ibid.*) Although the respondent testified he intended to tell the child eventually that he was not his biological father, the court found that fact demonstrated that the respondent was fully aware that the child regarded him as his father so much so that if he did not tell the child, the child would have no reason to believe otherwise. (*Ibid.*)

In *In re Marriage of Pedregon* (2003) 107 Cal.App.4th 1284 [132 Cal.Rptr.2d 861], the court likewise found the *Clevenger* elements met. (*Pedregon*, at p. 1290.) There, the husband and wife began living together in 1991 when the child was 18 months old, the husband treated the child as his son, and the child considered the husband his father and called him "daddy." (*Id.* at p. 1286.) The wife had averred under oath that the husband held himself out to be the child's natural father for over 12 years, placed the child on his health insurance, and requested the child use his last name; she further stated the husband was the only father the child had known, and the child was unaware the husband was not his biological father. (*Id.* at p. 1290.)

In *In re Marriage of Valle* (1975) 53 Cal.App.3d 837 [126 Cal.Rptr. 38] (*Valle*), the court relied upon *Clevenger* to conclude the respondent was estopped from denying paternity. (*Valle*, at pp. 840–842.) Expressly acknowledging each element of equitable estoppel, it held that to apply the doctrine, the evidence must establish: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely upon the conduct to his injury." (*Id.* at p. 841.) *Valle* involved circumstances where the respondent and the mother took in the natural children of the respondent's brother and represented to United States authorities that they were their natural offspring; the putative parents made such representations all during their upbringing; the children returned their love and fully accepted the parties as their own parents, referring to respondent as "Daddy" or "Papa"; and the children were ignorant of the true situation, and indeed did not know or remember their natural parents. (*Id.* at pp. 841–842.) Both parties conceded at trial that they regarded and treated the children all along as their own and loved them as such. (*Id.* at p. 842.) The court found these facts, as well as the fact the respondent sought to invoke the doctrine only to defeat the mother's claim to the children, warranted application of equitable estoppel. (*Ibid.*)

Here, the report of DNA tests confirming nonpaternity is dated September 2004, several months after Arzaga filed his answer to County's complaint. The trial court made an express factual finding that while Arzaga *believed* himself to be Karen's father, it was clear Arzaga "*truly did not know that he was not* [Karen's] *biological father* and only stopped acting as such when the

genetic test results were received in this action." (Italics added.) The evidence supports the court's finding that it was not until his receipt of the DNA test results that Arzaga learned he was in fact not Karen's biological father.

We have not found any case applying the doctrine of paternity by estoppel to an alleged father where the factual circumstances established that the alleged father acted without knowledge that he was not truly the child's biological parent. To the contrary, in each case it is apparent the father knew the true facts. Equitable estoppel is a principle grounded in fundamental fairness, and " ' "takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice." ' " (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 383 [2 Cal.Rptr.3d 655, 73 P.3d 517]; see *Cordova v. 21st Century Ins. Co.* (2005) 129 Cal.App.4th 89, 106 & fn. 56 [28 Cal.Rptr.3d 170]; *Valle, supra*, 53 Cal.App.3d at p. 840.) In general, the knowledge attributable to the party to be estopped must be actual and not merely presumptive knowledge. (*La Mancha Dev. Corp. v. Sheegog* (1978) 78 Cal.App.3d 9, 17 [144 Cal.Rptr. 59]; *Meyer v. Glenmoor Homes, Inc.* (1966) 246 Cal.App.2d 242, 264 [54 Cal.Rptr. 786]; *Primm v. Joyce* (1948) 87 Cal.App.2d 288, 291 [196 P.2d 829].)[5] While we are sensitive to the emotional detriment that can result to a child who has relied upon conduct of a person who has held himself out as a father, it would be unfair, in our view, to apply the doctrine to an individual whose conduct was based on his *mistaken* belief that he actually was the child's natural father.

■ It was plainly the trial court's intent to reach the contrary conclusion based on the evidence. However, its factual finding serves to defeat application of the parentage by estoppel. The finding, supported by Arzaga's testimony set forth above and the fact that the DNA testing took place only after County filed its lawsuit, demonstrates that at the time Arzaga made his representations to Karen and held himself out to her as her father, he was not "apprised of the facts." (*Valle, supra*, 53 Cal.App.3d at p. 841.) As a consequence, the doctrine of parentage by estoppel cannot apply.

---

[5] In applying the doctrine of equitable estoppel to a case involving questions of land title, the California Supreme Court in *Long Beach v. Mansell, supra*, 3 Cal.3d 462, acknowledged that in some cases, the knowledge to be attributed to the party to be estopped can be "imputed to him in light of the circumstances." (*Id.* at p. 491.) The court cited Pomeroy's general rule: " 'The truth concerning these material facts represented or concealed must be known to the party at the time when his conduct, which amounts to a representation or concealment, takes place; *or else the circumstances must be such that a knowledge of the truth is necessarily imputed to him.*' " (*Id.* at p. 491, fn. 27, quoting 3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 809, p. 216, original italics.) There is no evidence in this case as to Arzaga's health (i.e., that he lacked viable sperm) or the circumstances of Karen's conception permitting a conclusion that he should have known the true facts as to his parental status.

## DISPOSITION

The order is reversed. The parties shall bear their own costs on appeal.

McDonald, Acting P. J., and Irion, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 10, 2007, S155256.