Filed 4/23/13  Kranther v. Covey CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MICHAEL KRANTHER,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NANCY S. COVEY et al.,<br><br>    Defendants and Appellants. | B240631<br><br>(Los Angeles County<br>Super. Ct. No. SP007979) |

        APPEAL from an order of the Superior Court of Los Angeles County, Joseph Biderman, Judge.  Affirmed.

        The Law Office of John Derrick and John Derrick for Defendants and Appellants.

        Law Offices of Andrea Lynn Rice and Andrea Lynn Rice for Plaintiff and Respondent.

Appellants Nancy S. Covey and Sally Larimore, successor trustees of the Marguerite Elizabeth Kelly 1999 Revocable Trust (trust), appeal a March 23, 2012 order granting the petition of respondent Michael Kranther for reformation of the trust. We find no abuse of discretion, and thus we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      The Kelly Trust

Kelly created the trust on February 7, 1999. She executed a seventh and final amendment (seventh amendment) to the trust on December 22, 2008. As relevant to the present appeal, the seventh amendment provided as follows:

"D.      The residue of the Trust shall be distributed, free of trust (unless otherwise stated), as follows (the trust's original thirty (30) day condition of survivorship is now forty-five (45) days, as appears below):

"1.      Russell Richardson shall receive a 20% share of the residue of the Trust. If he does not survive settlor by forty-five (45) days, such share shall go to Sharon Richardson. If she does not survive settlor by forty-five (45) days, such share will go to Jesse E. Richardson or to his issue by right of representation.

"2.      Jesse E. Richardson shall receive a 5% share of the residue of the Trust. If he does not survive settlor by forty-five (45) days, such share shall go to Robert Richardson.

"3.      Kevin Rhodes shall receive a 5% share of the residue of the Trust. If he does not survive settlor by forty-five (45) days, his share will go to Christianne Rhodes. If she does not survive settlor by forty-five (45) days, said share will go to Delaney Rhodes and Regan Rhodes, in equal shares, or to the survivor.

"4.      Kelly Rhodes shall receive a 5% share of the residue of the trust. If she does not survive Settlor by forty-five (45) days, this gift will lapse [and] pass with the residue of the trust.

2

"5.    Marsha Bryson fka Marsha Jean Sirianni shall receive a 30% share of the residue of the Trust.  If she does not survive Settlor by forty-five (45) days, having died without issue, her share shall be distributed free of trust as follows:

"A one-half share to her husband, James Bryson, if, at the time of Marsha's death, they are living together as husband and wife.  If they are not, then said one-half share shall be distributed, in equal shares, to the National Muscular Dystrophy Association . . . and to St. Jude Children's Research Hospital . . . .

"A one-half share to the National Muscular Dystrophy Association . . . ."

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"E.    If any beneficiary of the residue of the settlor's trust fails to survive distribution of his/her share, the percentage of the residue that said beneficiary was to have received will be added to the other residuary beneficiaries' shares of the trust's residue in proportion to the then percentages applicable to all beneficiaries entitled to the residue at that time.  This gift will therefore pass to the other beneficiaries of the residue of the trust in proportion to their other interests in the residue according to Probate Code section 21111(b)."

Prior to signing the seventh amendment, Kelly had a recorded conversation with her attorney, Bennett Kerns (Kerns).  In relevant part, that conversation (as transcribed) was as follows:

"Kerns:  Okay.  Now you have already just signed the trust amendment and I notarized it.  Have you signed my notary book?  Is that correct?

"Kelly:  That is true.

"Kerns:  And did you read the trust amendment before you signed it?

"Kelly:  I certainly did.

"Kerns:  With your one good eye?

"Kelly:  It was my one good eye.

"Kerns:  And did you use a giant magnifying glass?

"Kelly:  Yes.

"Kerns:  You just showed it to me.

3

"Kelly: Right.

"Kerns: Now, is this amendment that I have drafted accurately reflecting the instructions you gave to us as far as the changes you wanted to make?

"Kelly: Absolutely. It's absolutely correct.

"[Tape off.]

"Kelly: That's also true.

"Kerns: We just had a brief discussion. The tape is back on. I noted that Marsha, who was given 20 percent of the trust residue under the fifth amendment, is now being given 30 percent. Is that correct?

"Kelly: Yes, that's right.

"Kerns: And Russell is continuing to get 20 percent of the [unintelligible]?

"Kelly: That's right.

"Kerns: Okay. Then you reduced some of the percentages of the residue that were going to other relatives. Is that correct?

"Kelly: That's true.

"Kerns: Okay.

"Kelly: . . . And I inserted a new name.

"Kerns: You added a new name indeed.

"Kelly: Right.

"Kerns: But to make sure, I can say that it took many minutes for you to read the amendment. But did you read all the pages that I gave you?

"Kelly: I did.

"Kerns: Okay.

"Kelly: All 3 I think it was.

"Kerns: Okay . . . small print. I charge by the word.

"Kelly: (Laughs.) Go home. (Laughs.)

"Kerns: Okay. Well then, are you satisfied that the amendment then reflects what your wishes are?

"Kelly: Yes. Exactly."

## II. Petition for Reformation of Trust

Kelly died on April 25, 2009. Upon her death, Kelly's daughter, Marsha Bryson, became the successor trustee.

On July 3, 2009, Bryson executed a will and trust known as the Marsha J. Bryson Living Trust. Among Bryson's listed assets were her expected distribution from her mother's trust.

Bryson died on July 25, 2009, just three months after her mother's death. Upon Bryson's death, Nancy S. Covey and Sally Larimore (trustees) became the successor cotrustees to Kelly's trust, and Kranther was nominated as executor of Bryson's estate and the successor trustee to her trust.

On October 28, 2009, Kranther filed a petition to reform Kelly's trust. The petition asserted that Kelly intended each of the beneficiaries named in her trust to receive a specified share of the trust estate if he or she survived Kelly by 45 days. This intent was reflected in paragraph 1.D. of the seventh amendment. Paragraph 1.E. of the seventh amendment, however, required a beneficiary not only to survive Kelly by 45 days, but also to survive distribution of the estate. The petition asserted that paragraph 1.E. had been included as a result of a scrivener's error, and it asked the court to reform the seventh amendment to accurately reflect Kelly's intent. The petition asserted that Bryson's estate had standing to bring the petition because although Bryson survived Kelly by more than 45 days, she did not survive the distribution of Kelly's estate.

Trustees filed an objection to the petition on December 2, 2009.

## III. Trial and Decision

### A. Trial

Margot Erni testified at trial that she is a legal assistant to Bennett Kerns. She said that Kelly called Kerns's office and told Erni that she wanted to make some changes to the percentages beneficiaries of her trust would receive. Erni jotted down the beneficiaries' names and percentages of the trust that Kelly wished them to receive and

5

gave her notes to Kerns. Kerns asked Erni to draft the seventh amendment, which she did; Kerns made further changes to the draft after she gave it to him. Kelly never told Erni why she wished to change her trust and she never told Erni she wanted to require beneficiaries to survive distribution of the trust.

Kerns testified that he initially prepared trust documents for Kelly in 1999. He prepared seven amendments to the trust over the following nine years, each of which changed the percentages to be distributed to the beneficiaries. When Kelly signed the seventh amendment, she was suffering from Parkinson's disease, had lost vision in one eye, and told Kerns she was losing vision in her other eye. Kerns did not believe her mental acuity had deteriorated, however, and he had no doubt that Kelly had testamentary capacity.

Kerns spent about an hour with Kelly before she signed the seventh amendment. During that hour, she read the documents he gave her, but "I do not know if she read the entire document or understood it."

Kerns testified that he does not typically put a "divestor" clause such as paragraph 1.E. in his estate planning documents. He put such a clause in the seventh amendment because "I made a mistake." He never discussed paragraph 1.E. with Kelly, and Kelly never asked him to provide for a divesting of a gift to a residuary beneficiary. Indeed, Kelly "wasn't involved at all in the language of paragraph 1-E." Kerns said he put the paragraph in to prevent a gift from lapsing, but said the paragraph was superfluous. He explained: "I just wanted to amplify in more formal language what I think the law already provided. If I may put it this way, I was being a little fancy. I had stumbled across the language and I thought I would put it in just to duplicate what I thought the effect of the language would have been anyway."

Michael Kranther testified that he and Bryson had been romantically involved in the past and remained friends afterwards. He was the successor trustee of her trust and the executor of her estate. Kerns originally represented Kranther as a successor trustee of Bryson's trust, but he no longer represented Kranther in any capacity. Bryson's trust was basically insolvent.

6

*B.     Order*

The court issued an order reforming the trust on March 1, 2012.  It explained its order as follows:

"The Petition is granted.  The Court orders paragraph 1(E) stricken from [the] Seventh Amendment to the Marguerite Elizabeth Kelly 1999 Revocable Trust U/D/T February 19, 1999.  All other provisions of the Seventh Amendment remain in full force and effect.

"The Court received no evidence that Marguerite Elizabeth Kelly ('Kelly') intended to include paragraph 1(E) and materially change her Trust to require a beneficiary to survive distribution of the Trust.

"Margot Erni testified about a telephonic conversation she had with Kelly prior to attorney Bennett Kerns ('Kerns') drafting the Seventh Amendment.  That conversation only mentioned Kelly's desire to change percentage distributions to the beneficiaries, not a new requirement that a beneficiary survive the distribution in order to receive their share.  Kerns met with Kelly after he had two telephone conversations regarding the proposed modifications.  According to Kerns, there was no mention by Kelly of a desire to add the language of paragraph 1(E) to the Trust prior to their meeting.  The Court finds that both Kerns and particularly Erni were credible witnesses.

"The Court heard a recording (Exh. 12) of Kelly stating that she had read, understood and was in agreement with all of the terms of the Seventh Amendment.  The material changes to the Trust included differences in the percentage allocations to beneficiaries—something that Kelly had done six prior times—as well as the addition of the language of paragraph 1(E).  Although Kelly firmly stated that she agreed with all of the provisions of the Seventh Amendment and while there is no challenge to her capacity, the Court finds that Kelly did not agree to paragraph 1(E).

"Petitioner seeks to discount Kerns' testimony as he may have had a conflict in his representation of Kelly, Margaret Bryson ('Bryson'), and Petitioner Kranther.  However, while the Court excluded testimony regarding Kerns' fee arrangement with Bryson's

7

Trust and Kranther, the Court is unable to conclude that Kerns would use any potential remuneration to testify falsely or with omission of material facts. Even if the Court were to disregard Kerns' testimony altogether, the inclusion of paragraphs 1[(D)] and 1(E) makes no sense. If Kelly had wanted to limit distributions only to beneficiaries who survive their own distribution, there would have been no need to include paragraph 1[(D)].

"Kerns' testimony that he had added paragraph 1(E) to take care of the possibility of lapsed gifts was nonsensical. All potentially lapsed gifts were covered elsewhere in paragraph 1. Nonetheless, petitioner's argument that Kelly's intention (never stated to anyone) was to prevent Bryson's husband from receiving Bryson's beneficiary interest is interesting speculation but without evidentiary support. However, Bryson herself took steps prior to her own death to prevent her husband from receiving such interest in any event.

"Objector seeks to have the Court speculate that Kelly had an undisclosed conversation with Kerns in which she told him to draft language requiring a beneficiary to survive distribution in order to receive it, while retaining language requiring 45 day survivorship, in order to prevent Bryson's husband from receiving any of the Bryson distribution if Bryson survived beyond 45 days but not as long as the ultimate distribution. This is a tortured and awkward argument.

"Kelly amended her Trust seven times. On each occasion, she sought to change the beneficiary percentages. The Court finds that Kelly's intention with the seventh amendment was the same as on the prior six amendments, merely to change the beneficiary percentages. Kern[']s error was just that—his own very sloppy mistake.

"The Petition is Granted."

On March 23, 2012, the court ordered that "the Petition is granted. Paragraph 1(E) is stricken from the Seventh Amendment to the Marguerite Elizabeth Kelly 1999 Revocable Trust U/D/T February 19, 1999. All other provisions of the Seventh Amendment remain in full force and effect." Notice of entry of the order was served on March 30, 2012. Trustees timely appealed.

8

**DISCUSSION**

Trustees concede that a court may reform a trust instrument if it is ambiguous or to give effect to the settlor's intentions. They contend, however, that (1) the seventh amendment was not ambiguous, and (2) the evidence does not support the trial court's conclusion that Kelly did not intend to require a beneficiary to survive distribution in order to inherit. We consider these issues below.

### I. The Seventh Amendment Is Facially Ambiguous

Trustees contend that paragraph 1.E. is clear on its face and does not conflict with any other provision, including paragraph 1.D. For the following reasons, we do not agree.

#### A. *Applicable Law*

"""'The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]' [Citations.]" (*Scharlin v. Superior Court* (1992) 9 Cal.App.4th 162, 168.) "In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it. [Citation.]" (*Ibid*.)

"'In interpreting a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect. (*Estate of Russell* (1968) 69 Cal.2d 200, 208-210.) Thus, extrinsic evidence as to the circumstances

9

under which a written instrument was made is admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible.  (*Id*. at p. 211.) On review of the trial court's interpretation of a document, the appellate court's proper function is to give effect to the intention of the maker of the document.  (*Id*. at p. 213.)

"......................................................................

"An ambiguity in a written instrument exists when, in light of the circumstances surrounding the execution of the instrument, '"the written language is fairly susceptible of two or more constructions."  [Citations.]'  (*Estate of Russell*[, *supra*,] 69 Cal.2d [at p.] 211.)

"Where a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity and give effect to the trustor's intention as expressed in the trust instrument.  (*Lissauer v. Union Bank & Trust Co*. (1941) 45 Cal.App.2d 468, 472-473 . . . .)"  (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73-74 (*Ike*).)


### B.     Analysis

Trustees contend that paragraph 1.E. is not ambiguous because "it is capable of only one interpretation — namely that if a beneficiary fails to live to see the distribution of the trust assets, then that beneficiary's share goes back to the residue to be shared among the other named beneficiaries."  They also contend that paragraphs 1.D. and 1.E. are not in conflict because they "serve distinct, not contradictory, purposes.  Paragraph 1-D deals with the designation of contingent beneficiaries during the 45-day period after the settlor's death should a primary beneficiary die.  Paragraph 1-E, on the other hand, is a catch-all residuary clause to prevent gifts from lapsing should an originally designated beneficiary fail to survive his or her final distribution."

We do not agree with trustees that paragraphs 1.D. and 1.E. are not in conflict. Under paragraph 1.D., Bryson was entitled to a share of the residue of her mother's estate if she survived her mother by 45 days.  Under paragraph 1.E., however, even if Bryson

survived her mother by 45 days, she would not be entitled to a share of her estate unless she *also* survived the distribution of the estate. Thus, in the circumstances presented here, where Bryson survived her mother by 45 days but did not survive final distribution of her estate, paragraphs 1.D. and 1.E. require inconsistent outcomes: Paragraph 1.D. requires distributing Bryson's 30 percent share to her estate, while paragraph 1.E. requires distributing it to Kelly's other named beneficiaries.[1] We therefore conclude that the seventh amendment is ambiguous on its face.

## II. The Trial Court Did Not Abuse Its Discretion by Reforming the Seventh Amendment to Eliminate Paragraph 1.E.

Trustees concede that a court may reform a trust instrument to give effect to the settlor's intentions. They contend, however, that the record did not support the trial court's conclusion that Kelly intended her beneficiaries, including Bryson, to receive a distribution from her trust so long as they survived her by 45 days. We do not agree.

### A. *Standard of Review*

Because reformation of a trust invokes a trial court's equity powers, we review an order of reformation for abuse of discretion. (E.g., *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256.)[2]

---

[1]     Paragraphs 1.D. and 1.E. would also have required different outcomes if Bryson had failed to survive her mother by 45 days. Under those circumstances, paragraph 1.D. would require distributing Bryson's share either to her husband (if they were still living together as husband and wife upon Bryson's death) or to charity, while paragraph 1.E. would require returning Bryson's share to the trust's residue for distribution to the other residuary beneficiaries.

[2]     "'Equity or chancery law has its origin in the necessity for exceptions to the application of rules of law in those cases where the law, by reason of its universality, would create injustice in the affairs of men.' (*Estate of Lankershim* (1936) 6 Cal.2d 568, 572-573 [although rule of law prohibited lawyer, as executor of estate, from recovering legal fees for services on behalf of estate, equitable principles called for departure from that rule].) The object of equity is to do right and justice. It 'does not wait upon

"'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)" (*In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 146.)

In reviewing the trial court's findings of fact for substantial evidence, "[i]t is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact.  Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.)  This is true even where, as here, much of the evidence is undisputed or uncontradicted:  "[I]f two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn.  We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's

---

precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.  "It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication." [Citation.]' (*Times-Mirror Co. v. Superior Court* (1935) 3 Cal.2d 309, 331.)  'The powers of a court of equity, dealing with the subject-matters within its jurisdiction, are not cribbed or confined by the rigid rules of law.  From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees . . . .  It is of the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions. [Citation.]' (*Bechtel v. Wier* (1907) 152 Cal. 443, 446.)  Equity acts '"in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." [Citation.]' (*Wuest v. Wuest* (1942) 53 Cal.App.2d 339, 346.)" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 770-771.)

findings and decision, resolving every conflict in favor of the judgment. [Citations.]" (*Ibid.*)[3]


B. *Trial Court's Equitable Authority to Reform a Trust*

California courts have long had the equitable power to modify the terms of a trust where modification is necessary to preserve the trust or serve the original intentions of the trustor. (*Ike, supra,* 61 Cal.App.4th at p. 79.) "'If, due to a mistake, the trust does not contain the terms that were intended by the settlor, the settlor or other interested party may maintain a suit in equity to have the instrument *reformed* so that it will contain the terms that were actually agreed upon or that reflect the testator's actual intent. The more common type of . . . error, which may be made by the settlor or the scrivener, is a drafting error that is referred to as a mistake in expression.' (Radford et al., The Law of Trusts and Trustees (3d ed. 2006) § 991, pp. 130-132, italics added, fns. omitted, followed in *Bilafer v. Bilafer* (2008) 161 Cal.App.4th 363, 370; see 161 Cal.App.4th at pp. 368-369.) [¶] 'Equity may intervene to correct a mistake in a trust whether it is an inter vivos trust or a testamentary trust, and may *reform* an inter vivos trust even after the settlor is dead.'" (*Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1603.)[4]

---

[3] As trustees correctly point out, a different rule appears to apply in cases involving interpretation of written instruments. "[W]hen there is no conflict in extrinsic evidence, the [appellate] court is not bound by inferences drawn from that evidence by the trial court. [Citations.]" (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 134.) That rule does not apply to the present issue, however, because the trial court exercised its equitable power to *reform* a trust, rather than its legal power to *interpret* the trust document.

[4] In 1986, the Legislature substantially revised the Probate Code and codified the common law equitable power of trial courts to modify the terms of a trust instrument where such modification is necessary to serve the original intentions of the trustors. (*Ike, supra,* 61 Cal.App.4th at p. 83.) Though this revision was intended to impose "'comprehensive' rules for modifying trusts (Recommendation Proposing the Trust Law (Dec. 1985) 18 Cal. Law Revision Com. Rep. (1986) pp. 511, 573 (Trust Recommendation)), the sections enacted do not expressly provide that they are the exclusive means to do so. Thus, 'the broader equitable power of trial courts to modify or

13

The court applied these principles to reform a trust in *Ike*, *supra*, 61 Cal.App.4th 51. There, trustors Virgil and Jeannette Ike married at ages 65 and 75, respectively. Both had been previously married; Virgil had two children by a prior marriage. (*Id.* at p. 58.) After their marriage, the Ikes created a revocable inter vivos trust, funded with separate and community property, which provided that the property would retain its separate or community character. The same day they executed the trust, however, the Ikes also executed a property agreement that appeared to indicate they had agreed to transmute all separate property into community property. (*Id.* at pp. 59-60.)

The trust provided that on the death of the first trustor to die, the trust would be divided into two separate trusts—the "survivor's trust" and the "decedent's trust"—each of which would hold the trustors' separate property and his or her half of the community property. (*Ike*, *supra*, 61 Cal.App.4th at p. 60.) Jeannette and Virgil apparently intended that the proceeds of the survivors' and decedents' trusts would be distributed to their beneficiaries upon the second spouse's death, regardless of which spouse died first; however, because of a drafting error, the trust's language appeared to indicate that Jeannette's share of the trust estate would be distributed to her beneficiaries only if she survived Virgil. (*Id.* at p. 63.)

Jeannette predeceased Virgil. After Virgil's death, his son Mark filed a petition for construction of the trust, contending that because Jeannette died first, none of the trust assets should be distributed to her designated beneficiaries. Jeannette's principal beneficiary, Doolittle, filed his own petition, arguing that the trust contained an ambiguity and that Jeannette and Virgil intended that, no matter who died first, the portion of the trust estate that had consisted of Jeannette's separate property and her share of the community property would be distributed to her beneficiaries. (*Ike*, *supra*, 61 Cal.App.4th at p. 66.) The trial court concluded that Jeannette and Virgil believed the

reform a trust is preserved by operation of section 15002, which expressly provides: "Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state."' (*Ike*, at p. 84.)" (*Bilafer v. Bilafer*, *supra*, 161 Cal.App.4th at p. 368.)

14

trust would dispose of their respective separate and community property to their designated beneficiaries, and it reformed the trust accordingly.

Mark appealed, contending that the trial court improperly rewrote the trust. (*Ike*, *supra*, 61 Cal.App.4th at p. 79.) The Court of Appeal disagreed and affirmed. It explained that the trial court had "ample equitable and statutory power to modify or reform" the distributive sections of the trust consistent with the trustors' intent. (*Id.* at p. 87.) Further, it said, the court properly exercised its power to reform the trust because "substantial extrinsic evidence, including the drafter's testimony, established that Jeannette and Virgil intended that upon the death of the survivor Jeannette's separate property and her interest in the community property would be distributed to the beneficiaries she designated in section 2 of article nine, and Virgil's separate property and his interest in the community property would be distributed to the beneficiaries he designated in section 1 of article nine." (*Ibid.*) Substantial extrinsic evidence also established that the expression of the trustors' distributive intent "was rendered ambiguous by the drafting attorney's admitted multiple drafting errors," including failing to make the decedent's trust irrevocable after the death of the first spouse. (*Ibid.*) Thus, the court concluded, because the trial court's findings were supported by substantial evidence, the court properly reformed the trust. (*Id*. at pp. 87-88.)

C.     *The Trial Court Did Not Abuse Its Discretion by Reforming the Seventh Amendment to Eliminate Paragraph 1.E.*

The trial court found that when Kelly amended her trust for the seventh and last time, she did not intend to require her beneficiaries to survive distribution in order to receive their share of the trust proceeds. That conclusion was supported by substantial evidence, including the following:

●     The original trust documents and the first six amendments thereto provided that the named beneficiaries would recover specific percentages of the trust residue if they survived Kelly for a fixed number of days—30 days in the original trust document

15

and the first two amendments, and 45 days thereafter.  Only the seventh amendment included the language of paragraph 1.E.

●      Kerns testified that "the 45-day survivorship period had always been discussed by us, Betty and I, with the understanding that if a beneficiary survived the 45-day period then it would be up to the beneficiary to do what he or she wanted to do thereafter, so that's why it was limited to the 45 days."  He continued:  "I can only go back to the beginning of my relationship with Betty Kelly where we discussed this concept from the beginning as to what she wanted in her trust.  After the initial period of survivorship being required — in the beginning in the trust it was 30 days, then it became 45 days — and our prior — giving you a long answer, I am sorry.  But our prior conversations had to do with the fact that Betty said the beneficiaries can do their own estate plan at any time and provide for their own distribution thereafter."  Further, "[t]he 45-day period was intended to apply to all residuary beneficiaries.  From the beginning of my drafting documents for Betty Kelly, at least in the beginning specifically, and I think two times thereafter in the years it happened.  She said after the initial survivorship period the beneficiary can do what the person wants to do with her or his own estate plan, and she'll leave it up to them to make their own decisions."

●      Margot Erni, Kern's legal assistant, testified that she spoke to Kelly on the telephone about the seventh amendment.  Kelly said she "wanted to make some changes in the percentage of the distribution."  Erni and Kelly did not discuss "any concept of [a] beneficiary having to survive distribution."

●      Kerns testified that with regard to the seventh amendment, he and Kelly discussed only "the change in percentage, the adding or deletion of names."  They "did not discuss the language of paragraph 1-E.  I recall specifically we did not discuss divesting of any residuary . . . beneficiaries' interest after 45 days."  He specifically testified that Kelly never asked him to include such a clause.

●      Kerns testified that he does not typically put in his estate planning documents a clause divesting beneficiaries of their interests in a trust if they do not survive distribution of the trust estate.  He added paragraph 1.E. to the seventh

16

amendment "to amplify the language in the trust document and limit it to what happens if somebody did not survive the 45 days and there was no alternate beneficiary designated." He testified: "If I may put it this way, I was being a little fancy. I had stumbled across the language and I thought I would put it in just to duplicate what I thought the effect of the language would have been anyway."

Taken together, the foregoing is substantial evidence that when Kelly executed the seventh amendment, she intended her beneficiaries to receive a share of the trust proceeds so long as they survived her by 45 days—without regard to whether they also survived distribution. The trial court did not err in so concluding and reforming the trust accordingly.

Trustees urge that the evidence did not support reformation of the trust because the undisputed evidence was that Kelly was mentally competent and diligently read the seventh amendment before she signed it. We agree that the evidence was undisputed that Kelly read the seventh amendment and was mentally competent. We cannot agree, however, that the trial court therefore was bound to conclude that Kelly appreciated the legal significance of paragraph 1.E. As we have said, the issue for our review is not whether there is some evidence supporting trustees' theory of the case—it is, instead, whether there was substantial evidence supporting the trial court's conclusions. The fact that Kelly read the trust before she signed it may be a significant piece of evidence, but it is hardly dispositive of her intent.

Trustees also urge that the trial court committed legal error by "in effect . . . switch[ing] the burden of proof." They explain: "[E]ven if there had not been any evidence that Betty had endorsed the substance of paragraph 1-E (a concession that is not made), that would not be a basis for granting the petition. For the court to properly grant the petition, Kranther had to have provided evidence that Betty *hadn't* intended to approve paragraph 1-E when she signed the seventh amendment; it was not for the successor trustees to prove the opposite." While we agree with trustees that Kranther bore the burden of proof, we do not agree that the trial court believed to the contrary. We also do not agree, as trustees suggest, that there was a "complete absence of . . .

17

evidence" that Kelly did not intend to include paragraph 1.E. in her amended trust. Rather, as we have said, we believe there was substantial evidence supporting the trial court's conclusions.

In light of the trial court's finding, supported by substantial evidence, that Kelly did not intend to include a paragraph divesting beneficiaries of their shares if they did not survive distribution, the court was well within its broad equitable discretion to strike paragraph 1.E. of the seventh amendment.

## DISPOSITION

The order granting the petition for reformation of trust is affirmed. Kranther shall recover his appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.